AMERICAN IRON AND STEEL INSTITUTE et al., Petitioners,

v.

ENVIRONMENTAL PROTECTION AGENCY, Respondent.

BETHLEHEM STEEL CORPORATION et al., Petitioners,

v.

ENVIRONMENTAL PROTECTION AGENCY, Respondent.

SHARON STEEL CORPORATION et al., Petitioners,

v.

ENVIRONMENTAL PROTECTION AGENCY, Respondent.

YOUNGSTOWN SHEET AND TUBE COMPANY, Petitioner,

v.

ENVIRONMENTAL PROTECTION AGENCY and Administrator,

Environmental Protection Agency, Respondents.

CF&I STEEL CORPORATION, Petitioner,

v.

ENVIRONMENTAL PROTECTION AGENCY, Respondent.

Nos. 74–1640, 74–1642, 74–1962, 74–2006 and 74–2256.

United States Court of Appeals, Third Circuit.

Argued June 9, 1975.

Decided Nov. 7, 1975.

---

David McNeil Olds, Blair S. McMillin, Thomas C. Wettach, Robert M. Walter, Thomas J. Duman, Reed, Smith, Shaw & McClay, David S. Watson, Peter G. Veeder, Frank J. Clements, Thorp, Reed & Armstrong, Pittsburgh, Pa., Max N. Edwards, Richard E. Schwartz, Collier, Shannon, Rill & Edwards, Washington, D. C., Richard E. Nolan, Henry H. Korn, Davis, Polk & Wardwell, New York City, H. Stephen Madsen, Baker, Hostetler & Patterson, Cleveland, Ohio, K. Robert

Conrad, Charles J. Bloom, Pepper, Hamilton & Scheetz, Philadelphia, Pa., David W. Furgason, William C. Robb, Welborn, Dufford, Cook & Brown, Denver, Colo., for petitioners.

Wallace H. Johnson, Martin Green, Edmund B. Clark, Bradford F. Whitman, Robert V. Zener, Nancy Speck, Washington, D. C., for respondent, Environmental Protection Agency.

Before ADAMS, HUNTER and GARTH, Circuit Judges.

## OPINION OF THE COURT

JAMES HUNTER, III, Circuit Judge:

This is a petition brought by the American Iron and Steel Institute and several individual steel companies to review regulations promulgated by the Administrator of the Environmental Protection Agency on June 28, 1974.[1] In these regulations, entitled "Effluent Guidelines and Standards, Iron and Steel Manufacturing Point Source Category," the Administrator established nationwide single number effluent limitations for point sources[2] in the iron and steel industry engaged in "primary" (or basic manufacturing) operations.[3] Contending that the Administrator's regulations do not conform to the requirements of the Federal Water Pollution Control Act Amendments of 1972 (hereinafter, the "Act"),[4] the petitioners seek judicial review of the Administrator's actions under section 509(b)(1) of the Act.[5] Two other steel companies—Youngstown Sheet and Tube Company, and CF&I Steel Corporation—filed similar petitions in the Sixth and Tenth Circuits, respectively. By order of each Circuit, the cases were transferred. to this Court, and they have been consolidated with the petitions filed here. In addition, the Natural Resources Defense Council, Inc., has filed a brief as Amicus Curiae.

### I

Petitioners' first, and most basic, challenge is to the Administrator's very power to promulgate nationwide single number effluent limitations for existing point sources.[6] Petitioners contend that the limitations which are to be binding on them can only be established by the permit-granting authorities (principally, the States), which are to follow *guidelines* promulgated by the Administrator. The Administrator contends that he is not merely empowered to promulgate guidelines, but may establish *limitations* which are binding throughout the country and which must be incorporated into any permit issued to any individual point source. The answer to this dispute, which goes to the very heart of the administration of the Act, depends upon our resolution of the interrelationship of three key sections of the Act—301,[7] 304[8] and 402.[9]

Petitioners rely heavily on the fact that there is no section in the Act which explicitly authorizes the Administrator to establish single number effluent limi-

1. 39 Fed.Reg. 24114, 40 C.F.R. § 420.10 et seq.

2. 33 U.S.C. § 1362(14) defines "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."

3. Regulations for "secondary" (or finishing) operations have not yet been promulgated.

4. 33 U.S.C. § 1251 et seq. (Supp. II 1972). The relevant sections of the Act are set out in full in the appendix to this opinion.

5. 33 U.S.C. § 1369(b)(1).

6. The power of the Administrator to establish such limitations for *new* point sources under § 306 of the Act, 33 U.S.C. § 1316, is unquestioned. Thus, petitioners' challenge to the new source regulations, discussed in parts VI and VII of this opinion, takes a different approach.

7. 33 U.S.C. § 1311.

8. *Id.* § 1314.

9. *Id.* § 1342.

tations for existing point sources. They contend that the lack of such explicit authorization cannot have been an oversight, since the Act expressly authorizes the Administrator to promulgate other types of regulations. For example, the Administrator has the explicit authority to set standards for new point sources under section 306(b)(1)(B) [10] and for toxic discharges under section 307(a)(2),[11] and to establish pretreatment standards under section 307(b) [12] and water quality standards under section 303(b).[13] Many of these sections not only explicitly authorize the Administrator to promulgate regulations establishing such standards, but also specify in some detail the times and procedures to be followed.

In contrast to these sections, the only section explicitly authorizing the Administrator to establish any regulations pertaining to effluent standards for existing point sources—section 304(b)—merely authorizes the promulgation of "guidelines" rather than precise standards or single number limitations. While section 301(b) refers to "effluent limitations" for existing point sources, that section does not explicitly authorize the Administrator (or anyone else) to promulgate regulations establishing such limitations. Rather, using the passive voice, that section merely states that effluent limitations for such point sources "shall be achieved" by July 1, 1977 through the application of the "best practicable control technology currently available" (hereinafter, "BPCTCA"), and by July 1, 1983 through the application of the "best available technology economically achievable" (hereinafter, "BATEA"). Under petitioners' construction of the Act, these effluent limitations are to be "achieved" through the permit process. They contend that the permit issuing authorities, under section 402, are to determine the effluent limitations to be

achieved by applying, to individual point sources, the factors enumerated in the guidelines previously promulgated by the Administrator under section 304(b).

The two consolidated cases present graphic examples of the differing consequences of the two interpretations. Both Youngstown and CF&I contend that they have local problems which can be fully appreciated only by a local permit-issuing authority. Youngstown claims that its plants in the Mahoning Valley provide one third of the direct employment in that area and that they are indirectly responsible for a significant percentage of the remaining jobs. It also claims that its plants are very old (several were built before World War I), that many will be forced to close if the limitations promulgated by the Administrator are enforced, and that because of the heavy concentration of steel plants along the shores, the river is unavailable for recreational uses anyway. Youngstown claims that a local authority, in appreciation of these factors, might have required somewhat less stringent controls. CF&I points to a different problem. It contends that the installation of anti-pollution devices in its Colorado plants would cause a significant net loss of water through evaporation, which would have serious consequences in a state where water is a scarce and valuable resource. Contending that only a local authority would fully appreciate the impact of the anti-pollution devices on scarce water resources,[14] CF&I argues that its case is another illustration of the necessary for flexibility at the local level.

We acknowledge that these arguments are not without force, but we believe that the Administrator does have the authority to promulgate effluent limitations under section 301. While we admit that Congress did not express its intent

---

10. *Id.* § 1316(b)(1)(B).

11. *Id.* § 1317(a)(2).

12. *Id.* § 1317(b).

13. *Id.* § 1313(b).

14. It is undisputed that the Administrator did not even consider this evaporation problem. But see Part IV(c) of this opinion.

on this point with particular clarity, we conclude, after examining the entire statutory scheme and the legislative history, that the Administrator's power to promulgate effluent limitations under section 301 can be inferred.[14a] We thus respectfully disagree with the contrary conclusion reached by the Eighth Circuit in *CPC International, Inc. v. Train,* 515 F.2d 1032 (8th Cir. 1975). With respect to the peculiarly local problems of some point sources, as illustrated by Youngstown and CF&I, we believe that our holding that the Administrator does have power under section 301 does not preclude some flexibility at the local level. This point will be addressed in detail in part II of this opinion.

Perhaps the strongest indication in the Act that the Administrator has the power under section 301 to promulgate effluent limitations can be found in section 509(b)(1). This section provides for judicial review "of *the Administrator's action* . . . (E) in approving or *promulgating any effluent limitation* or other limitation *under section 301* . . . and (F) in issuing or denying any permit under section 402." Not only does this section explicitly refer to the Administrator's action in promulgating a section 301 effluent limitation, but its separate references, in subsections (E) and (F), to section 301 effluent limitations and section 402 permits indicates that the limitations and permits have independent significance.

The Eighth Circuit in *CPC International* discounted the importance of section 509(b)(1)(E) by contending that the section 301 limitation referred to must be one promulgated under section 301(c), which empowers the Administrator to "modify the requirements of subsection (b)(2)(A) of this section" with respect to an individual plant upon a stringent showing of hardship and good faith efforts at compliance. We cannot accept the Eighth Circuit's reasoning on this point. In the first place, section 301(c) does not authorize the Administrator to *promulgate* any effluent limitations. Rather, it merely authorizes him to *relax* the requirements of section 301(b) with respect to 1983 "BATEA" standards,[15] and thus it cannot be read to be within the scope of section 509(b)(1)(E). Furthermore, the legislative history shows quite clearly that section 301(c), which was only added during the House-Senate Conference, did not even exist at the time section 509(b)(1)(E) was originally drafted.[16]

---

**14a.** See part I of Judge Adams' opinion in which Judge Garth and I join. As part I of that opinion aptly notes, Congress' failure to express more clearly its intent on such a crucial matter is indeed disturbing and we hope that Congress will heed our admonition to draft its legislation with greater clarity. The admitted ambiguities in this Act, however, cannot be an excuse to avoid deciding the case before us, and we are satisfied that our resolution of the Act's ambiguities is the one most consistent with Congress' expressed intent.

**15.** In fact, § 301(c) itself seems to support the Administrator's position by presupposing the existence of a section 301 effluent limitation which the Administrator can relax. Petitioners, noting that § 301(c) empowers the Administrator to "modify the *requirements*" of § 301(b)(2)(A), contend that this merely means that the Administrator may relax the requirement that "BATEA" technology be used. However, it is clear from Senator Muskie's statement in support of the Conference bill

that Congress contemplated the relaxation of *limitations:*

> "The Conferees have provided, however, a mechanism for individual point-source-by-source consideration in section 301(c). That section provides that the Administrator may modify any effluent *limitation* based on 'best available technology' to be achieved by July 1, 1983 . . . [Emphasis added]."

Environmental Policy Division of the Library of Congress, *A Legislative History of the Water Pollution Control Act Amendments of 1972,* 93d Cong., 1st Sess. (Comm. Print 1973), at 172 [hereinafter, "Leg.Hist."].

**16.** In the original Senate bill, S. 2770, § 509(b)(1) contained essentially the same language it does now [see Leg.Hist. at 1713], while § 301(c) was what is now § 301(d), and no subsection in § 301 contained what is now § 301(c) [see Leg.Hist. at 1610]. It is clear that what is now § 301(c) was added during the House-Senate Conference. See Leg.Hist. at 172 and 304.

Further support for the Administrator's power can be found in section 505.[17] which permits citizen suits to enforce compliance with the Act. Section 505(a)(1) permits such suits against any person "who is alleged to be in violation of (A) an effluent standard or limitation under this Act. . . ." Section 505(f) defines "effluent standard or limitation," for purposes of section 505(a), as ". . . (2) an effluent limitation or other limitation under section 301 . . . ; or (6) a permit or condition thereof issued under section 402 of this Act . . . ."[18] If petitioners' view were correct—that effluent limitations required under section 301 can only be established through the permit process under section 402—then subsections (2) and (6) of section 505(f) would appear redundant. The fact that Congress felt it necessary to include separate references to section 301 limitations and to section 402 permits indicates that they have independent significance and that a person could be in violation of section 301(b) independently of section 402.

Petitioners attempt to explain away this redundancy by arguing that the separate references merely indicate that "the legislative draftsmen appreciated that a § 402 permit condition is not always an effluent limitation—it might be a monitoring or reporting requirement." This contention fails to eliminate the redundancy, and it fails to explain why

Congress did not consider it sufficient to include only a reference to a violation of a section 402 permit. While a permit may contain conditions other than section 301 limitations, petitioners' position is that a section 301 limitation can only be established through the permit process. Thus, given the reference to violations of section 402 permits, any reference to violations of section 301 limitations would still be superfluous under petitioners' view.

The Eighth Circuit in *CPC International* attempted to explain away the redundancy on a different ground. It viewed the independent reference to section 301 as being necessary to encompass section 301(f), which prohibits the discharge of radiological, chemical, or biological warfare agents and high-level radioactive wastes into navigable waters. However, section 301(f) is not an "effluent limitation," but rather a flat prohibition on all such discharges. Section 301(b) is the part of section 301 which requires compliance with *effluent* limitations, and section 301(f) would seem to be a type of "other limitation" referred to in section 505(f)(2).

Section 401(a)(1)[19] also lends support to the Administration's position. This section requires an applicant for a permit to provide the permit-issuing agency with "a certification from the State . . . that any such discharge will comply with the applicable provisions of

---

We also see no merit to petitioners' contention, advanced in their Reply Brief, that the initial bill's distinction between the Administrator's actions having a national impact and those having a local impact, the former to be reviewable in the District of Columbia Circuit and the latter in the Circuit of the affected locality, somehow is support for their position that effluent limitations can only be established locally. To the extent that Congress ever intended that, this view would seem hard to reconcile with enacted version of section 509, which draws no distinction between "national" standards and "local" effluent limitations. Furthermore, even if Congress had considered § 301 limitations to have a local impact, in contrast to unspecified "federal standards," the earlier version of § 509 still provided for judicial review "of the *Administrator's action* in approving or *promulgating*" section

301 limitations. The fact that Congress may have thought that the *impact* was local does not mean that the Administrator does not have the power to promulgate such limitations. Congress may instead have recognized that some "national" limitations may have a predominantly local impact on those industries which are concentrated primarily in one region of the country.

**17.** 33 U.S.C. § 1365.

**18.** The Senate Report states, with reference to section 505, that "[i]n addition to violations of Section 301(a), citizens are granted authority to bring enforcement action for violations of effluent limitations under section 301 . . . and any condition of any permit issued under section 402." Leg.Hist. at 1500.

**19.** 33 U.S.C. § 1341(a)(1).

sections 301, 302, 306, and 307 of this Act." The section then proceeds to state:

"In the case of any such activity for which there is not an applicable effluent limitation or other limitation under sections 301(b) and 302, and there is not an applicable standard under sections 306 and 307, the States shall so certify . . . ."

This section, by requiring the State to certify the *absence* of a section 301 effluent limitation when someone has applied for a permit, seems to presuppose that section 301 limitations have an existence *independent of the section 402 permits*, and that they are generally expected to have been promulgated prior to the issuance of such permits.

There are a number of other sections in the Act which refer to the establishment of effluent limitations "under" or "pursuant to" section 301. While it is true that none of these sections specify *how* these limitations are to be established or *who* is expected to establish them, the repeated references to such limitations, when coupled with the complete absence of any qualification that such limitations are to be established through the permit process, is further support for the position that Congress intended the section 301(b) limitations to have an independent existence. If they are to have such an independent existence, it is reasonable for the Administrator to conclude that the promulgation of regulations establishing such limitations is within his inherent rule-making power.[20] Those sections containing references to effluent limitations include section 301(e) ["Effluent limitations established pursuant to this section"]; section 302(c)[21] ["The establishment of effluent limitations under this section shall not operate to delay the application of any effluent limitation established under section 301 or section 306 of this Act"];

section 316(b)[22] ["any standard established pursuant to section 301"]; and section 316(c)[23] ["effluent limitations established under section 301"].

Finally, we believe that a joint reading of sections 304 and 301 lends support for the Administrator's position and undercuts that of the petitioners. Sections 304(b)(1)(A) and 304(b)(2)(A) require that the Administrator's regulations, which are to be applicable by the years 1977 and 1983, respectively, *"identify . . . the degree of effluent reduction attainable"* through application of the best technology practicable or available. This meshes in very neatly with section 301(b), which requires the "achievement" of effluent limitations by those dates applying the same respective levels of technology. Reading the two sections together, it would seem inconsistent to require, on the one hand, both the achievement of effluent limitations applying certain levels of technology [section 301(b)] and the promulgation of regulations by the Administrator which "identify . . . the degree of effluent reduction attainable" through those levels of technology [section 304(b)], while at the same time allowing permit grantors to determine for themselves, bound only by section 304(b) guidelines, what levels of effluent limitation are to be achieved.

The Eighth Circuit in *CPC International* relied in part on the permit provisions of the Act, especially section 402(d)(2), which provides:

"No permit shall issue . . . if the Administrator within ninety days of the date of transmittal of the proposed permit by the State objects in writing to the issuance of such permits as being outside the guidelines and requirements of this Act."

The Eighth Circuit, emphasizing the phrase "as being outside the guidelines," concluded that "[i]t is hard to imagine a

---

**20.** See § 501(a), 33 U.S.C. § 1361(a), which provides: "The Administrator is authorized to prescribe such regulations as are necessary to carry out his functions under the Act."

**21.** 33 U.S.C. § 1312(c).

**22.** *Id.* § 1326(b).

**23.** *Id.* § 1326(c).

clearer indication that the permit-issuing authority is to follow the guidelines promulgated under § 304(b), and is not to refer to independent regulations under § 301." We respectfully disagree, and believe that the Eighth Circuit read too much into section 402(d)(2). Even if the word "guidelines" is a specific reference to the section 304(b) guidelines, the Eighth Circuit's emphasis on that word ignores the fact that the permit grantors must also comply with the "requirements" of the Act. In section 402 (b)(1)(A), the Act requires that any permits issued "apply, and insure compliance with, any applicable requirements of sections *301*, 302, 306, 307 and 403." Section 304, unlike section 301, is never explicitly mentioned in section 402. We thus read the whole of section 402 as requiring compliance both with section 301 limitations and with any guidelines promulgated by the Administrator.

We also believe that a close reading of the legislative history supports the Administrator's position. The Senate Report accompanying the bill stated:

"It is the Committee's intention that *pursuant to subsection 301(b)(1)(A)*, and Section 304(b) the *Administrator* will interpret the term 'best practicable' when applied to various categories of industries as a basis for *specifying* clear and precise effluent *limitations* to be implemented by January 1, 1976." [24]

Virtually identical language was used by Senator Muskie, the principal author of the bill, in explaining the Report of the House-Senate Conference Committee.[25]

Senator Bentsen, a member of the Senate Public Works Committee which drafted the bill, gave perhaps the clearest indication that Congress contemplated that the Administrator would establish section 301 limitations:

"In phase I, for point sources of pollutants, effluent limits shall be estab-

lished not later than January 1, 1977 [now July 1, 1977], which comply with specifically defined levels of effluent controls and treatment. As defined in section 301(b)(1) of the bill, and as elaborated in *the regulations which we anticipate the Administrator shall issue pursuant to section 301* and section 304, these 1976 [now 1977] goals shall be at least . . . the 'best practicable control technology currently available' for [industrial] point sources. . . ." [26]

The petitioners, as did the Eighth Circuit in *CPC International,* also rely on portions of the legislative history as support for their interpretation, but we believe that a close reading of the parts on which they rely does not contradict our analysis. Many of the statements indicating the need for flexibility, precise federal guidelines and a meaningful state role do not prove that the Administrator does not have the power to establish limitations under section 301. As we shall explain in greater detail in part II of this opinion, they merely indicate that the Administrator was empowered to promulgate guidelines in addition to limitations. Furthermore, some of the legislative history relied on by petitioners is ambiguous. One example is the following exchange between Senator Mathias and Senator Muskie:

"Mr. Mathias. Does section 301(b)(2)(A) on page 76 comtemplate that a State, or the Administrator if appropriate, might be able to set the 1981 [now 1983] effluent limitations almost on an individual point source by point source basis?

"Mr. Muskie. Section 301(b)(2)(A) as well as section 301(b)(1) anticipate individual application on point sources through the procedures under the permit program established under section 402." [27]

---

24. Leg.Hist. at 1468 (emphasis added). The bill as enacted, of course, had a date of July 1, 1977 instead of January 1, 1976.

25. Leg.Hist. at 169.

26. *Id.* at 1283 (emphasis added).

27. *Id.* at 1391.

Unlike the petitioners, we do not see Senator Muskie's answer as support for the view that section 301 effluent limitations can only be *established* through the permit process. Rather, it is fully consistent with the Administrator's position that previously promulgated nationwide effluent limitations are to be *applied* to individual plants through the permit process. Given the question asked, his answer must be taken primarily as a denial that the Administrator was to set limitations on a plant-by-plant basis, not that he lacked the authority to establish *nationwide* limitations. He merely indicated that those limitations were to be *applied* by local authorities on a local basis.

The strongest statement in support of the view that effluent limitations were to be *established,* as well as applied, through the permit process appears in a letter from EPA Administrator William Ruckelshaus to Chairman Blatnik of the House Public Works Committee:

> "Effluent limitations required by Section 301 would be established and applied to all point sources of discharges covered by the Act by means of permits issued under Title IV." [28]

We believe that this statement should not be given great weight. This Act was predominantly a congressional product, with the Administration playing a relatively insignificant rule in its drafting, at least with respect to those parts of the Act at issue here. Consequently, we believe that the comments by the EPA Administrator reflecting his interpretation of then pending legislation should be given less weight in determining the meaning of the Act than statements by Senators such as Muskie and Bentsen who had a far greater responsibility for the Act's drafting.

The Eighth Circuit in *CPC International* also relied heavily on the fact that several Representatives, principally Abzug and Rangel, were concerned about the lack of a federal veto power over the permit grantors in the early House version of the bill.[29] The Eighth Circuit concluded that "the creation of the veto power would make no sense if the EPA was already empowered to promulgate regulations under § 301." We disagree. We believe that a veto power could have been considered just as necessary to ensure compliance by the permit grantors with section 301 limitations as with section 304 guidelines.

As a final point, we note that the Supreme Court has consistently stated that, where an Act of Congress is fairly susceptible of differing constructions, the interpretation made of it by the agency charged with its administration should be given considerable deference. *Udall v. Tallman,* 380 U.S. 1, 16–18, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Power Reaction Co. v. Electricians,* 367 U.S. 396, 408, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961); *McLaren v. Fleischer,* 256 U.S. 477, 480–81, 41 S.Ct. 577, 65 L.Ed. 1052 (1921). This position was most recently reiterated in *Train v. NRDC,* 421 U.S. 60, 87, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975), where the Supreme Court, in upholding the Administrator's interpretation of section 110 of the Clean Air Act,[30] stated:

> "We therefore conclude that the Agency's interpretation of §§ 110(a)(3) and 110(f) was 'correct' to the extent that it can be said that any particular interpretation of a complex statute such as this is the 'correct' one. Given this conclusion, as well as the facts that the Agency is charged with administration of the Act, and that there has undoubtedly been reliance upon its interpretation by the States and other parties affected by the Act, we have no doubt whatever that its construction was sufficiently reasonable to preclude the Court of Appeals from substituting its judgment for that of the Agency."

---

**28.** *Id.* at 844.

**29.** Such a veto power was eventually provided in section 402(d)(2), 33 U.S.C. § 1342(d)(2).

**30.** 42 U.S.C. § 1857c–5.

Similarly, the Supreme Court also stated:

"Without going so far as to hold that the Agency's construction of the Act was the only one it permissibly could have adopted, we conclude that it was at the very least sufficiently reasonable that it should have been accepted by the reviewing courts." [31]

For the reasons expressed earlier, we believe that the Administrator's interpretation of this very complex Act—at least with respect to his power to promulgate effluent limitations under section 301—is the more reasonable one, and should be given appropriate deference.[32]

## II

■ Having concluded that the Administrator does have the power to promulgate effluent limitations under section 301, we are now faced with the question of interpreting the nature of the Administrator's powers and duties under section 304 and of reconciling our construction of section 304 with that of section 301. We begin by observing that the Administrator not only has the power, but the explicit obligation to promulgate "guidelines" under section 304. In these guidelines, the Administrator is specifically required (1) to "identify . . . the degree of effluent reduction attainable through the application" of the relevant standard of technology [sections 301(b)(1)(A) and 301(b)(2)(A)], and (2) to "specify factors to be taken into account in determining the control measures and practices to be applicable to point sources . . . within such categories or classes" [section 304(b)(1)(B)][33] (emphasis added). This second requirement clearly contemplates that the guidelines promulgated by the Administrator on the basis of broad categories or classes of industries are to provide guidance to those authorities (presumably, the permit grantors) which determine the precise degree of effluent control required of any individual point source. The only other interpretation possible would be that the Administrator is required to promulgate guidelines for broad categories or classes which are to guide himself in setting precise limitations for specific point sources—clearly an illogical interpretation, and, as noted below, one which is contrary to the clearly expressed congressional intent that the Administrator is not to consider the particular circumstances of individual point sources.

■ Sections 304(b)(1)(B) and 304(b)(2)(B) also specify a number of factors to be taken into account in determining the control measures required for compliance with the respective 1977 and 1983 technological standards. These factors include cost, the age of the equipment and facilities involved, engineering aspects of application of various types of control techniques, and non-water quality environmental impact. The first question to address is who is to consider these factors—the Administrator in pro-

---

31. 421 U.S. at 75, 95 S.Ct. at 1479.

32. We also reject the argument made by Youngstown that differing language in §§ 301(b)(1)(A) and 301(b)(2)(A) indicates that the administration of the Act differs as between 1977 and 1983 limitations. Noting that § 301(b)(1)(A) requires the achievement of "effluent limitations for point sources," whereas § 301(b)(2)(A) requires the achievement of "effluent limitations for categories and classes of point sources," Youngstown appears to argue that the 1983 limitations can only be established on a category or class basis while conceding that they can be established on an individual basis for 1977. However, we see nothing in the legislative history indicating that the regulatory scheme was to be so radically different as between the 1977 and 1983 limitations. Furthermore, it makes little sense to have the limitations applied on a point source by point source basis in 1977, while permitting limitations on a category-wide basis six years later. We thus conclude that any ambiguity created by §§ 301(b)(1)(A) and 301(b)(2)(A) on this point was inadvertent and was a result of imprecise legislative drafting.

33. Substantially similar language is included in section 304(b)(2)(B), pertaining to guidelines for 1983 standards.

mulgating the guidelines, or the permit grantors in applying the guidelines to individual point sources? The statute is somewhat ambiguous on this point. By listing the various "factors" in sections 304(b)(1)(B) and 304(b)(2)(B) immediately after stating that the guidelines are to "specify factors to be taken into account," Congress would appear to have intended that these were factors to be considered by those authorities applying the guidelines to individual point sources within the categories outlined by the Administrator. On the other hand, the statute states that these are factors "relating to the assessment" of the relevant technology, and sections 304(b)(1)(A) and 304(b)(2)(A) state that the *Administrator* is required to "identify . . . the degree of effluent reduction attainable through the application" of the relevant level of technology. This suggests that the factors are ones to be considered by the Administrator in "assessing" the proper level of technology.

The legislative history, however, indicates quite clearly that a full consideration of these factors at the permit-issuing stage was not intended. In Senator Muskie's statement in support of the bill as approved by the House-Senate Conference Committee, he explained:

> "The Conferees intend that the factors described in Section 304(b) be considered only within classes or categories of point sources and that such factors not be considered at the time of the application of an effluent limitation to an individual point source within such category or class." [34]

Similarly, Representative Dingell, in discussing one of the factors ("cost") enumerated in section 304(b), stated:

> "The conference report emphasizes on page 121 a very important point. The report states:
>
> 'The conferees intend that the Administrator or the State, as the case may be, will make the determination of the economic impact of an effluent limitation on the basis of classes and categories of point sources, as distinguished from a plant by plant determination.'
>
> "Thus, a plant-by-plant determination of the economic impact of an effluent limitation is neither expected, nor desired, and, in fact, it should be avoided." [35]

Nevertheless, it does appear that Congress contemplated that some degree of consideration of the enumerated factors was to be made by the permit grantors on a plant-by-plant basis. The Senate Report, after referring to the section 304(b) factors, stated:

> "In applying effluent limitations to any individual plant, the factors cited above should be applied to that specific plant." [36]

At first glance, this statement seems hard to reconcile with the previously quoted statements indicating that the factors were not to be considered on a plant-by-plant basis. We note, however, that the Senate Report just quoted said that the factors were to be "applied," not that they were to be "considered." We therefore believe that the statements quoted can be reconciled if we determine that any "consideration" to be given the specified factors by the permit grantors should be considerably less than *de novo*. Thus, it seems that the Administrator is to conduct the primary consideration of the enumerated factors for classes and categories and is to specify to the permit grantors how some variation in the standards should be made in light of those factors. In other words, the permit grantors are to have a limited and carefully circumscribed discretion to take into account factors as specified by the Administrator. To hold that they have no discretion does not make sense in light of the clear command in section 304(b)(1)(B) that the "guidelines" promulgated by the Administrator "specify

---

**34.** Leg.Hist. at 172.

**35.** *Id.* at 254–55.

**36.** *Id.* at 1468.

factors *to be taken into account* in determining the control measures and practices to be applicable *to point sources . . . within such categories and classes.*" Nor would it make any sense in light of the very fact that the permit grantors are to be guided by "guidelines." Finally, it would be inconsistent with Congress' concern that the guidelines provide precise guidance. As Senator Muskie stated:

"Except as provided in Section 301(c) of the Act, the intent is that effluent limitations applicable to individual point sources be as uniform *as possible.* The Administrator is expected to be precise *in his guidelines* so as to assure that similar characteristics, regardless of their location or the nature of the water into which the discharge is made, will meet similar effluent limitations." [37]

This indicates to us that, while uniformity was clearly a major congressional concern, some amount of local variation, carefully circumscribed by precise guidelines, was contemplated. In short, uniformity was to be achieved by effluent standards within a given category which were similar, rather than identical or unitary.[38]

This conclusion is further buttressed by several indications in the legislative history that the guidelines were intended to provide permissible "ranges" of effluent limitations. With respect to the 1977 "BPCTCA" standards the Senate Report, for example, stated:

"The Administrator should establish the *range* of best practicable levels based upon the average of the best existing performance by plants of var-

ious sizes, ages, and unit processes within each industrial category." [39]

With respect to the 1983 "BATEA" standards, the same Report continued:

". . . [T]he Committee intends that effluent limitations be based upon application of best available technology as defined by the Administrator. In making the determination of 'best available' the Committee expects the Administrator to apply the same principles involved in making the determination of best practicable as outlined above except that rather than the *range* of levels established in reference to the average of the best performers in an industrial category the *range* should at a minimum be referenced to the best performer in any industrial category." [40]

Similarly, Senator Muskie, in summarizing the bill as reported out of the House-Senate Conference, stated:

"The Administrator should establish the *range* of best practicable levels based upon the average of the best existing performance by plants of various sizes, ages, and unit processes within each industrial category." [41]

Having concluded that the local permit-issuing authorities have a carefully circumscribed degree of discretion, as evidenced by Congress' concern that the Administrator's guidelines "specify factors to be taken into account" and that they provide "ranges," we are then faced with the problem of reconciling this limited amount of discretion with out previous conclusion that the Administrator has the power to promulgate effluent limitations under section 301. The answer, in our view, lies in the fact that

---

**37.** *Id.* at 172.

**38.** As the Eighth Circuit in *CPC International* stated, "[t]his preoccupation with the precision of the guidelines as a means of achieving uniformity makes no sense in a regime where the permit-issuing authorities are to look, not to the guidelines, but to regulations promulgated under § 301." Where we disagree with the Eighth Circuit is its conclusion that the permit

grantors were not also constrained by § 301 limitations. As explained below, we conclude that they are bound to follow both § 301 limitations *and* § 304 guidelines.

**39.** Leg.Hist. at 1468 (emphasis added).

**40.** *Id.* (emphasis added).

**41.** *Id.* at 169 (emphasis added).

Congress clearly contemplated that there was to be a uniform "ceiling" which no polluter would be permitted to exceed. The key to understanding the interrelationship between sections 301 and 304 can, we believe, be found in the following excerpt from the Senate Report:

> "In defining best practicable for any given industrial category, the Committee expects the Administrator to take a number of factors into account. These factors should include the age of plants, their size and the unit processes involved and the cost of applying such controls. In effect, for any industrial category, the Committee expects the Administrator to define a *range* of discharge levels, *above a certain base level applicable to all plants within that category.* In applying effluent limitations to any individual plant, the factors cited above should be applied to that specific plant. *In no case, however, should any plant be allowed to discharge more pollutants per unit of production than is defined by that base level.*" [42]

■■ In our view, the section 301(b) limitations represent a single number effluent limitation which prescribes the minimum amount of control (the "base level"), or conversely, the maximum amount of effluent discharge (a "ceiling") that is permissible. In determining this "base level," and concomitant pollutant ceiling, the Administrator is to consider the numerous differences in processes and capabilities of point sources.[42a] Having determined the "base level," and the "ceiling," he must then promulgate guidelines which are to guide the permit-issuing authorities in deciding whether, and by how much, the limitation to be applied to any individual point source is *more* stringent than the base level (in terms of requiring more effective technology), and more stringent than the ceiling (in requiring a lower amount of effluent discharge). Thus, we reconcile sections 301 and 304 in the following manner: the section 301 limitations represent both the base level or minimum degree of effluent *control* permissible and the ceiling (or maximum amount of effluent discharge) permissible nationwide within a given category, and the section 304 guidelines are intended to provide precise guidance to the permit-issuing authorities in establishing a permissible level of discharge that is more stringent than the ceiling.

### III

■ We now turn to the regulations being challenged to see if they comply with our interpretation of the statutory scheme. It is immediately apparent that the regulations establish only single number effluent limitations for each of twelve subcategories within the iron and steel industry.[43] While the regulations comply with the requirement in sections 304(b)(1)(A) and 304(b)(2)(A) that they "identify . . . the degree of effluent reduction attainable" through application of the relevant standard of technology ("BPCTCA" or "BATEA"), they do not specify any factors to be taken into account in determining the control measures to be applied to individual point sources within the categories and classes, as required by sections 304(b)(1)(B) and 304(b)(2)(B). Furthermore, they do not specify permissible "ranges" of limitations below the ceiling.

---

42. *Id.* at 1468 (emphasis added).

42a. While Congress used the term "base level," henceforth in our discussion of limitations we will refer to a *ceiling* of effluent discharge which the polluter cannot exceed, since we believe that the latter term more clearly expresses Congress' intent.

43. Those twelve subcategories are: by-product coke, beehive coke, sintering, blast furnace (iron), blast furnace (ferromanganese), basic oxygen furnace (semi-wet air pollution control methods), basic oxygen furnace (wet methods), open hearth furnace, electric arc furnace (semi-wet methods), electric arc furnace (wet methods), vacuum degassing, and continuous casting.

The Administrator, however, contends that he satisfied these requirements. In the regulations themselves, he states:

"The Agency considers that the limitations already represent ranges, taking into account differences in processes used and other factors. Subcategorization has been used to take these factors into account with different limitations for each subcategory. Within subcategories, exceptions to the limitations have been provided where appropriate, thus constituting a range. Each numerical limitation represents a maximum value over a given period of time. This, in effect, represents a range from zero up to the specific limitation." 39 Fed.Reg. 24117 (comment # 25).

We believe that this response is insufficient. We do not agree that the "exceptions" referred to satisfy the "range" requirement, since only one of the twelve subcategories—By-Product Coke —contains any such exception. The statement that a range exists from zero up to the limitation is unsupportable since for all of the subcategories the Administrator concluded, with respect to the new source standards, that a "zero discharge" level was not feasible at this time. Thus, the "range" admittedly encompasses standards that cannot be met. More important, the regulations provide absolutely no guidance to the permit-issuing authorities as to what factors to consider or how to set the particular discharge level within a feasible range below the ceiling established under Section 301(b). Finally, we disagree with the Administrator's contention that "sub-categorization" provides a range. The Administrator's subcategorization merely divided the entire iron and steel making industry by means of the types of processes employed, and it does not reflect any of the innumerable differences within the particular subcategories. No guidance is given with respect to the remaining section 304(b) factors, such as age, costs and engineering aspects, which we previously concluded must be "specified" in order to guide the permit grant-

ors in exercising their carefully circumscribed discretion in setting precise standards for individual point sources.

■ The Administrator contends that sufficient flexibility in the regulations is provided through the "variance" procedure, which allows individual discharges to obtain variances from the limitations upon a showing that the factors relevant to a particular point source are *"fundamentally different* from the factors considered in the establishment of the guidelines." Our responsibility, however, is not to determine whether the Administrator has provided for flexibility, but whether he has followed the statutory scheme established by Congress. Regardless of whether the establishment of a variance procedure is within the Administrator's discretion, we do not believe that the Administrator can ignore his obligation to promulgate guidelines specifying factors to be considered and ranges above a base level. We also note that the variance procedure provides for less flexibility than we believe Congress contemplated, since it permits deviations from otherwise rigid and unitary limitations only where the circumstances of the particular plant are "fundamentally different" than those from which the effluent limitation was derived.

■ Having concluded that the regulations failed to constitute valid "guidelines" (despite their title), since they failed to provide meaningful ranges or guidance in considering individual factors, the question then arises as to the scope of our remand. Should we merely remand for promulgation of guidelines, leaving the single number limitations intact, or should we also remand for reconsideration of the limitations? We conclude that the latter approach is preferable. The guidelines can serve a meaningful purpose under our analysis only if they are coupled with limitations which represent the "ceiling" or maximum degree of effluent discharge permissible. In promulgating these regulations, the Administrator appears to have considered it his duty to establish uniform nationwide limitations, rather than es-

tablishing a ceiling with detailed guidelines to guide the grantors within a feasible range below the ceiling.[44] Consequently, although we do not suggest that the present limitations cannot perforce represent ceilings, it is possible that those limitations might be more stringent than they would have been if they had merely been intended to represent such levels. Thus, we believe that the Administrator, in addition to promulgating guidelines, should reconsider the limitations with the base level and ceiling concepts in mind.

## IV

Petitioners raise several other contentions with respect to the process by which the Administrator determined the 1977 "BPCTCA" and 1983 "BATEA" standards in his regulations. As noted in part II of this opinion, we believe it was clearly Congress' intent, despite the ambiguous wording in section 304(b), that the Administrator consider the enumerated factors in setting standards for classes and categories of industries. Petitioners contend that the Administrator failed to give sufficient consideration to these factors or to articulate his reasoning with sufficient clarity.

 At the outset, it is important for us to articulate our standard of review. As in other cases involving review of an administrative agency's rule-making actions we are governed by an "abuse of discretion" standard—in other words, we must not substitute our judgment for that of the agency, but must determine whether the Administrator's

actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Administrative Procedure Act § 10(e), 5 U.S.C. § 706(2); *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Delaware Citizens for Clean Air, Inc. v. Administrator,* 480 F.2d 972, 975–76 (3d Cir. 1973). In order to facilitate meaningful judicial review, we should require administrative agencies to "articulate the standards and principles that govern their discretionary decisions in as much detail as possible." *Environmental Defense Fund, Inc. v. Ruckelshaus,* 142 U.S.App.D.C. 74, 439 F.2d 584, 598 (1971). See also *Greater Boston Television Corp. v. FCC,* 143 U.S. App.D.C. 383, 444 F.2d 841, 851 (1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). However, we should not reverse an agency's decision that is not fully articulated where we can reasonably discern the basis for the agency's action. *Bowman Transportation, Inc. v. Arkansas—Best Freight System, Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974). Furthermore, the Administrator's conduct is entitled to a "presumption of regularity." *Citizens to Preserve Overton Park, supra,* 401 U.S. at 415, 91 S.Ct. 814.

A. *"Age."*—The first factor enumerated in section 304(b) which petitioners contend the Administrator did not fully consider was that of "age." Petitioners contend that the Administrator, faced with the statutory mandate to consider age, concluded that age was not relevant. However, this inaccurately states

---

**44.** While it is true that the Final Development Document accompanying the regulations makes some references to "base levels," it is clear that the Document used the term in a very different sense than the one in which we believe Congress used it. As we noted earlier (see notes 42 and 42a *supra* and accompanying text), we believe that Congress in referring to "base level" meant a "ceiling" on the permissible amount of effluent discharge. Page 257 of the Development Document (Appendix at 1521a), however, states that the Agency first determined the "base or minimum level of treatment . . . already in existence for

practically all plants within the industry in any given subcategory," and then "added on" to that base level to reach the levels required by the "BPCTCA" and "BATEA" standards. Thus, the "base level" referred to in the Final Development Document was in reference to the level of treatment "already in existence," rather than to the maximum degree of effluent discharge the Administrator determines is permissible under the Act. We see nothing in the Development Document indicating a consideration of the type of "base level" or "ceiling" about which we are concerned.

what the Administrator did. The Administrator did in fact consider age, but concluded, after studying the plants sampled, that "the processes and treatment systems are similar regardless of the age and size of the plant.[45] Furthermore, as the regulations themselves state, the division of the industry by process was also, generally speaking a division by age:

"The Agency has subdivided the steel making segment primarily along operational lines because the waste water volumes and pollutant parameters vary with the type of operation being conducted. In addition, *the processes reflect the age of the technology employed.* Subcategorization of coke making by the older beehive and the newer by-product operations and steel making by the older open hearth and the newer basic oxygen and electric arc furnace operations is indirectly subcategorization by age.

"The treatment technology to be applied is primarily a function of the pollutants present and hence is a function of the type of operation conducted. *The type of pollutants present is not a function of the size or age of the operating facilities.* Land availability for application of the treatment technology is not a function of size or age since many new as well as old mills are limited on the area available for installation of treatment facilities and vice versa . . . Many of the older mills have better treatment than some of the newer ones and vice versa." 39 Fed.Reg. at 24116, comment # 16 (emphasis added).

■ We believe that this quotation shows that the Administrator did consider age and did sufficiently articulate his reasoning, to the extent that he concluded that age was not by itself relevant to the type of treatment technology or processes to be installed, and that separate and explicit categorization by age was not warranted. We further believe,

after examining the data in the Final Development Document, that the Administrator's conclusions in this respect are fully supportable. Where we believe the Administrator erred, however, was in his failure to consider age as it had a bearing on the cost or feasibility of retrofitting plants. While all the plants in a certain older subcategory (e. g., beehive coke) may require the same technological processes to reduce effluent discharges, the fact that all the plants within that subcategory were built long before plants in another subcategory may present special problems in installing anti-pollution devices. Similarly, in a subcategory where there is considerable variation in age, the fact that the processes are similar may mean that the same type of control technology can be installed, but it does not necessarily mean that the ease with which that technology can be installed, or the ability to comply with effluent limitations once it has been installed, is not affected by age. Since we see no evidence that the Administrator considered age in this light, remand is appropriate. If he concludes on remand that age is not relevant to the cost or feasibility of retrofitting plans, as well as to the processes and treatment system, that conclusion will be valid to the extent it is supported by the record.

B. *"Engineering Aspects."*—Petitioners raise several points here in contending that the Administrator did not sufficiently consider this factor. They contend, *inter alia,* that for several subcategories the Administrator has suggested technology which is not currently available; that virtually all of the limitations are based on reduced flow rates which have not been demonstrated; and that many of the limitations are based on transfer technologies but lack guidelines on the engineering requirements for such transfers. Instead of considering these points as they affect the regulations in their entirety, we will defer any consideration of them until part VII of

---

**45.** Final Development Document at 107, Appendix at 1401a.

this opinion, in which we consider the specific challenges to individual limitations.

 The only contention we shall consider here is that in each of two subcategories—vacuum degassing and continuous casting—the Administrator surveyed only two plants which were not representative of the subcategories as a whole. In particular, they contend that the plants surveyed were built on "green field sites," which enabled them to construct large lagoons for the treatment of waste materials, and that the treatment systems were built simultaneously with the production facilities, thereby making it easier for them to meet effluent limitations than plants which must be retrofitted. The Administrator's response to petitioner's challenge is that given the extraordinary complexity of promulgating uniform guidelines and limitations, he cannot be expected to consider all the engineering factors in specific situations. He further contends that, to the extent that a particular plant's inability to comply with an effluent limitation is attributable to the fact that it is operating under conditions "fundamentally different" than the surveyed plants, it could obtain a variance. Petitioners in support of their challenge have failed to document their assertions that reliance on studies of plants with "unrepresentative" engineering characteristics has resulted in unrealistic limitations. They refer to no record deficiency that would overcome a presumption of regularity in the Administrator's conduct. Accordingly we are convinced that the regulations cannot be declared arbitrary or capricious on this ground.

 C. *"Non-water quality environmental impact (including energy requirements)."*—Petitioners contend that there is no evidence in the record to indicate that the Administrator considered these factors. We disagree, however, and believe that the Final Development Docu-

ment accompanying the regulations (especially section VIII of the Document, found in Appendix at 1522a–1581a) clearly shows that he did consider them in some detail. For each category, and for each level of technology (1977 "BPCTCA" and 1983 "BATEA" standards), the Administrator considered both the problems of air pollution and solid waste disposal, as well as the problem of additional energy requirements caused by installation of the necessary anti-pollution devices. In the by-product coke subcategory, for example, the Document identified the types of air pollution emissions likely to occur and concluded that "[i]f a vapor recirculation or solvent extraction facility for dephenolization is added to the system, significant reductions in both parameters are achieved." (Appendix at 1534a). Similarly, the Document identified the solid wastes likely to be generated by treatment systems, and concluded that they could either be internally consumed through reuse in the mill, incinerated, or used as landfill (*Id.*). With respect to additional energy requirements, the Document estimated the additional annual operating costs in terms of power for each of the two treatment alternatives—$2,175.00 for alternative I, and $31,500.00 for alternative II (Appendix at 1523a). The Administrator then evaluated the overall impact of the limitations on air quality, solid waste problems and energy requirements for all subcategories (Appendix at 1583a–1584a, 1629a and 1630a), and concluded that "[t]he enhancement of water quality management provided by these proposed effluent limitations substantially outweighs the impact on air, solid waste, and energy requirements" (Appendix at 1584a). Given the failure of petitioners to present contrary evidence as to the effects of the limitations in these areas,[46] we cannot say that the Administrator's consideration of these factors was insufficient or that his conclusions were arbitrary and capricious.

---

**46.** For example, after noting that the Administrator determined that the additional energy requirements for alternative I treatment technology for by-product coke in 1977 would be

0.22 kwh/kkg, petitioners claim: "Nowhere is it shown how this number was established, whether it is good, bad or indifferent." Petitioners, however, have pointed to no evidence

A special problem is presented by CF&I Steel Corporation. As noted at the outset of this opinion, CF&I objects to the effluent limitations on the ground that they did not take into account the problem of water loss caused by recycle systems,[47] a problem which it claims is serious in the arid and semi-arid western states. It appears, however, that CF&I never raised this contention at the agency level, when these regulations were being formulated with extensive participation on the part of the rest of the petitioners. Normally, this would preclude our consideration of this contention for the first time at this stage. See *Unemployment Compensation Commission of the Territory of Alaska v. Aragon,* 329 U.S. 143, 155, 67 S.Ct. 245, 91 L.Ed. 136 (1946); *Portland Cement Association v. Ruckelshaus,* 158 U.S.App.D.C. 308, 486 F.2d 375, 394 (1973). Petitioners claim that the rule barring *de novo* consideration of challenges to agency action in a reviewing court should not apply here since the agency proceedings were rule-making rather than adjudicatory and since the Administrator failed to follow his mandatory and affirmative responsibility to consider certain statutory factors. Whatever merit there may be to this contention in the abstract, we do not believe that this is an appropriate case to deviate from the general rule. Labelling these proceedings "rule-making" cannot obscure the fact that CF&I's challenge is to actions of the Administrator which affect it alone. Only three other steel mills in the entire country are located in arid or semi-arid regions,[48] and CF&I is the only company which has alleged that installation of anti-pollution devices would have an adverse effect on the water supply. Thus, this contention is one of particular and localized concern, and was not a problem which we believe was so obvious to the Administrator that it was arbitrary and capricious for him to have failed to consider it *sua sponte* during the rule-making stage.[49] We believe it would be highly disruptive to the administrative process to allow a company to sit back and wait until the regulations were published in final form before coming forth and contending that the agency had failed to consider the peculiarly local impact of its regulations in a certain region. However, while we do not believe that we can invalidate the regulations on the ground that the Administrator failed to consider this problem, we have already indicated that the matter should be remanded to the Administrator for the promulgation of guidelines and for the reconsideration of the limitations in light of the "base lev-

indicating that the Administrator's figure is unrealistic. Furthermore, as noted previously, the Administrator estimated the cost of the additional energy requirement to be $2,175.00. From this, and from the Administrator's later statement that the environmental benefits outweighed any impact on energy requirements, we believe we can infer, within the meaning of *Bowman Transportation, supra,* that the Administrator found the figure to represent a tolerable level.

47. CF&I estimates that at present its plant causes the loss of 4.65 million gallons of water per day and that, upon installation of the necessary anti-pollution devices, this amount would increase by an additional 7 million gallons per day. The Administrator, however, disputes these estimates.

48. Besides CF&I plant in Colorado, those plants are a United States Steel plant in California. Appendix at 1343a–1344a.

49. CF&I contends that the Administrator should have been aware of the water shortage problem because of the Federal Government's funding and sponsorship of water resource projects throughout semi-arid regions of the country, such as the Fryingpan-Arkansas Project, and because the EPA was specifically advised of Colorado's water shortage problem with respect to effluent guidelines for the beet-sugar industry. However, the fact that the Administrator perhaps should have been aware of the water scarcity problems in Colorado does not mean that it should have known that recycling systems required to meet effluent limitations for the steel industry would have had a potentially serious effect on the water supply.

We also reject CF&I's contention that the regulations are invalid because they conflict with state law requiring water conservation. To the extent that these federal regulations are valid and are in conflict with state law, they take precedence under the Supremacy Clause of the Constitution. *Cf. Florida Avocado Growers v. Paul,* 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963).

el" and "ceiling" concepts. We do not mean to preclude CF&I from raising its particular concerns about water scarcity in the context of the proceedings on remand. *Cf. Portland Cement Association, supra* at 394–95.

■ *D. "Costs."*—The final factor which petitioners contend the Administrator did not sufficiently consider was that of "costs." We have already concluded that the Administrator did not sufficiently consider the problem of age as it pertained to the cost and feasibility of retrofitting existing plants, and our present discussion of the cost factor will not repeat what was said previously. Our first task here is to clarify what Congress intended when it directed the Administrator to take costs into account. It is immediately apparent that Congress contemplated that the Administrator should give greater consideration to the cost of compliance when defining 1977 "BPCTCA" technology levels than he should when defining the 1983 "BATEA" levels. Section 304(b)(1)(B), states that the factors relating to an assessment of "BPCTA" "shall include consideration of the total cost of application of technology in relation to the effluent reduction benefits to be achieved from such application." This is in contrast to section 304(b)(2)(B), which merely requires that the assessment of the factors "shall take into account . . . the cost of achieving such effluent reduction."

■ Nevertheless, while costs were intended to be given greater weight in defining "BPCTCA", it is clear that even with that 1977 standard, the cost of compliance was not a factor to be given primary importance. Furthermore, Congress clearly intended that the Administrator consider costs on a class or category basis, rather than as a plant-by-plant basis. As Senator Muskie stated in support of the House-Senate Conference Committee Report:

"The modification of subsection 304(b)(1) is intended to clarify what is

meant by the term 'practicable.' The balancing test between total cost and effluent reduction benefits is intended to limit the application of technology *only* where the additional degree of effluent reduction is *wholly out of proportion* to the costs of achieving such marginal level of reduction *for any class or category of sources.*

"The Conferees agreed upon *this limited cost-benefit analysis* in order to maintain uniformity within a class and category of point sources subject to effluent limitations and to avoid imposing on the Administrator any requirement to consider the location of sources within a category or to ascertain water quality impact of effluent controls, *or to determine the economic impact of controls on any individual plant in a single community.*" [50]

■ With respect to the 1983 "BATEA" standards, Senator Muskie intended that the type of assessment should be basically the same, except that there should be no cost-benefit analysis. Although there is some ambiguity as to precisely how much weight should be given to cost, it seems that the Administrator would be governed by a standard of "reasonableness":

"In making the determination of 'best available' for a category or class, the Administrator is intended to apply the same principles involved in making the determination of 'best practicable' (outlined above), *except as to cost-benefit analysis* . . .

"*While cost should be a factor* in the Administrator's judgment, *no balancing test will be required.* The Administrator will be bound by *a test of reasonableness.* In this case, the reasonableness of what is 'economically achievable' should reflect an evaluation of what needs to be done to move toward the elimination of the discharge of pollutants and what is

---

**50.** Leg.Hist. at 170 (emphasis added).

achievable through the application of available technology—*without regard to cost.*[51]

With respect to the overall impact of the legislation, Congress clearly contemplated that cleaning up the nation's waters might necessitate the closing of some marginal plants. As Senator Bentsen stated:

> "There is no doubt that we will suffer some disruption in our economy because of our efforts; many marginal plants may be forced to close."[52]

In sum, while it is clear that the Administrator must consider cost, some amount of economic disruption was contemplated as a necessary price to pay in the effort to clean up the nation's waters, and the Administrator was given considerable discretion in weighing costs.

With these expressions of legislative intent in mind, we turn to consider the specific points raised by petitioners. Their contentions are essentially twofold: (1) that the Administrator's consideration of costs was insufficient and incomplete, in part because he excluded certain cost factors and because his promulgation of regulations for only "pri-

mary" (or "phase I") operations[53] precluded him from evaluating the full impact of pollution control devices; and (2) that the Administrator acted arbitrarily and capriciously in promulgating regulations in the face of evidence that many plants cannot raise the necessary capital to finance the installation of anti-pollution devices and would be forced to close.

 With respect to the first contention, we believe it is clear that the Administrator did consider the cost impact of the regulations. The EPA contractor developed operating and capital cost estimates for each level of technology within each subcategory, and cost-benefit diagrams were prepared for each subcategory.[54] The estimated costs were based on an "average size plant," as determined from the surveyed plants, and were then multiplied by the total number of facilities within each subcategory to obtain a figure representing the industry-wide costs per subcategory. The EPA also estimated the total cost (including amortization) of complying with both the "BPCTCA" and "BATEA" standards to be $82.3 million, a figure which represented 0.37% of the 1972 gross reve-

---

**51.** *Id.* (emphasis added). The ambiguity here is created by the evident inconsistency between the statements that "cost should be a factor" and that reasonableness should be determined "without regard to cost." Nevertheless, it is clear that for "BATEA" standards, cost was to be less important than for the "BPCTCA" standards, and that for even the "BPCTCA" standards cost was not to be given primary importance.

**52.** *Id.* at 1282.

**53.** See note 3 *supra* and accompanying text.

**54.** Petitioners challenge the cost-benefit studies as being inadequate and conclusory. As we noted before, however, a cost-benefit analysis is not required at all for any technology level other than the 1977 "BPCTCA" standards, and even there it is supposed to be only a "limited" analysis. See text accompanying footnote 50 *supra*. Also, Congress well recognized the impossibility of obtaining a mathematically accurate cost-benefit analysis in the area of pollution control. The portion of the

Senate Report discussing § 302 of the Act, which requires a more specific cost benefit analysis for "water quality standards" than does § 304, states:

> "The Committee recognizes that no mathematical balance can be achieved in considering relative costs and benefits nor would any precise formula be desirable, but in each case the Administrator or the State will be able to determine whether there is any reasonable connection at all between the costs which a particular effluent limitation would impose and any benefits (including the attainment of natural water quality) which might be derived."

Leg.Hist. at 1466. This difficulty in quantifying such a balance has also been discussed in Note, The Federal Water Pollution Control Act Amendments of 1972: Ambiguity as a Control Device, 10 Harv.J.Legis. 565, 587–88 (1973). Cf. *Portland Cement Association v. Ruckelshaus,* 158 U.S.App.D.C. 308, 486 F.2d 375, 387 (1973). The necessarily subjective nature of such an analysis supports the view that the Administrator must have broad discretion in weighing the costs and benefits.

nue of the steel industry. It further estimated that the total annual costs for both air and water pollution controls after 1983 would be $1.24 billion, or 5.54% of the industry's gross revenue in 1972. On the basis of these figures, and after referring to the section of the Final Development Document discussing the deleterious effects of the pollutants sought to be controlled, the Administrator concluded:

> "The Agency believes that the benefits of thus reducing the pollutants discharged justify the associated costs, which though substantial in absolute terms, represent a relatively small percentage of the total capital investment in the industry." [55]

Given our standard of review of agency action and the relative weights we believe Congress intended the Administrator to assign as between the need for pollution abatement and costs, we conclude that this assessment, when coupled with the economic impact analysis to be discussed below, was neither arbitrary nor capricious.

A troublesome question is presented by petitioners' contention that the costs estimated by the Administrator were artificially low because certain factors were excluded. Petitioners point to the fact that the Final Development Document listed several factors which admittedly affected costs, but which were excluded from the cost analysis. Petition-ers contend that these factors, which include such things as land acquisition and site clearance costs, generate costs which are as large as those which the Administrator included in his estimates. However, petitioners have pointed to no data which would support their allegation as to the magnitude of these excluded costs factors.[56] Furthermore, many of these factors were excluded because they were inherently site-specific or because they could not be evaluated. For these reasons, we do not believe we can conclude that the exclusion of these factors from the costs analysis was arbitrary or capricious.

Petitioners' chief objection here is that since regulations for only primary (or phase I) operations were promulgated, no cost consideration was given to the impact of the yet-to-be-promulgated regulations for secondary operations. The "Kearney Report" estimated that those costs would be very substantial, and that the total water pollution control costs would be three to five times as high as those for primary operations (Appendix at 214a, 314a). However, we believe that the Administrator acted within the permissible scope of his discretion in dividing the steel industry into two phases. Nothing in the Act precludes him from doing so,[57] and he was operating under rigid time constraints, a court injunction[58] and severe manpower problems. Given our conclu-

---

**55.** 39 Fed.Reg. 24118.

**56.** Their brief merely cites the conclusory and undocumented statement which they had made in a report to the agency during the rule-making proceedings. Appendix at 1098a.

**57.** Petitioners argue that the Administrator's consideration of the costs for only phase I operations was contrary to the mandate in § 304(b)(1)(B) that he consider "total cost." We note initially that there is no such requirement in § 304(b)(2)(B), pertaining to 1983 "BATEA" standards. More important, we note that Congress intended by the phrase "total cost" only to require consideration of both "internal" and "external" costs; there is no indication that Congress intended by this phrase to preclude separate cost studies for separate regulations governing two or more broad types of operations within a particular industry. As Representative Jones stated:

> "The term 'total cost of application of technology' as used in section 304(b)(1)(B) is meant to include those internal, or plant costs sustained by the owner or operator and those external costs such as potential unemployment, dislocation, and rural area economic development sustained by the community, area, or region."

Leg.Hist. at 231. As discussed later in this opinion, we believe that the Administrator gave sufficient consideration to these factors.

**58.** *National Resources Defense Council, Inc. v. Train,* 6 ERC 1033 (D.D.C.1973), rev'd in part, 166 U.S.App.D.C. 312, 510 F.2d 692 (1974).

sion that the Administrator had the power to promulgate regulations for the two phases separately,[59] we do not believe that the fact that costs were not considered for secondary or phase II operations necessarily requires invalidation of the phase I regulations, for which costs were thoroughly considered. Given Congress' desire that progress toward pollution abatement be expeditious, we do not think it would be advisable to require that these regulations be stayed until the Administrator has assessed the costs of phase II regulations, and we are limiting the scope of our remand to what we believe are the most essential points.

Nevertheless, we are concerned that the Administrator be required at some point to assess the overall impact of his regulations in both phases. Otherwise, it is possible that the Administrator might consider the costs reasonable for each phase separately, without ever considering whether the aggregate costs on a particular industry warrant such strict standards. We thus believe that the competing interests can best be served by requiring the Administrator, when he promulgates the phase II regulations, to evaluate the total costs involved for those regulations as well as for phase I regulations.

Turning to petitioners' other main contention, we are satisfied that the Administrator considered the problem of the industry's capability of meeting these costs, and we cannot say that his conclusion was arbitrary or capricious. Petitioners rely heavily on the "Kearney Report," which was commissioned and adopted by the EPA.[60] It is true, as petitioners contend, that this Re-

port predicts that enforcement of the regulations may force some plants to close. However, the Report believed that only 9 of the 63 integrated steel plants in the country were "prime candidates for closure or curtailment of a significant portion of their operations," and these were all identified as "marginal" plants. As the Report concluded:

"Generally, it cannot be stated that the problems and costs of pollution control are the only, or even the principal reasons for the potential curtailments of closures of these plants. They have had a history of problems and were considered marginal operations before the impact of pollution control was felt. Rather it can be stated that pollution control is the final blow, like the 'straw that broke the camel's back.' It is entirely probable that some of those plants would ultimately have been partially or entirely close, even without pollution control requirements . . ." Appendix at 305a.

The Report further stated that, on the basis of past experience, it was probable that a significant number of laid off workers (roughly 50%) would be rehired at other plants within the industry. (Appendix at 307a).

Petitioners also rely on another report (the "Booz, Allen Report") as well as on the Kearney Report as support of their contention that they could not raise the necessary capital to finance the expenditure. However, both reports relied in part on the fact that the steel industry at the time was under price controls (Appendix at 258a, 284a, 349a). Subsequent to the publication of

---

59. We also do not see much merit to petitioners' contention that the failure to promulgate phase II regulations deprives them of the ability to plan rationally in determining which plants cannot be operated economically and should be closed rather than retrofitted with pollution abatement equipment. Petitioners have presented no evidence to show that the design of treatment works for one phase would be dependent on the other. Furthermore, petitioners have been participating ac-

tively in the rule-making proceedings now under way for phase II regulations, and thus have a general idea as to what will be required of them. While petitioners do not yet know the precise numerical figures to be established in the limitations and guidelines, we believe they have sufficient knowledge to be able to make informed business decisions.

60. 39 Fed.Reg. 24116 (comment # 23); Appendix at 1692a.

those reports, controls were lifted, resulting in a substantial increase in steel prices. Furthermore, the economic position of the steel industry improved dramatically in 1974, to the extent that several companies announced large-scale expansion and modernization plans.[61] The Booz, Allen Report indicated that financing of pollution control devices would be impossible only in the absence of price increases. It further indicated that if an increase in $10 per ton were achieved, the industry could not both expand capacity as desired *and* install pollution abatement equipment, but would have to make a choice (Appendix at 349a). Given Congress' clearly expressed concern that pollution control devices be installed even at the expense of some economic dislocation, we cannot conclude that the Administrator's regulations, to the extent that they would require postponement of capacity expansion in order to install pollution abatement devices, are arbitrary and capricious.[62] It is not the role of the courts to determine whether capacity expansion is preferable to installation of pollution control equipment. Rather, it is a choice for the Administrator to make, governed only by a standard of reasonableness.

Youngstown makes a special appeal based on the allegedly disproportionate impact that enforcement of the regulations would have on its plant and on the surrounding community in the Mahoning Valley. However, as the quotation in text accompanying footnote 50 indicates, the Administrator is not *required* "to consider the location of sources within a category." Furthermore, the "Ernst and Ernst Report," which was primarily concerned with the impact in the Mahoning Valley of more stringent water quality standards,[63] concluded that of the several options available to the steel industry in that region, it was most likely that all operations would be maintained. It also noted the possibility that some older and less efficient open hearth furnaces would be replaced by cleaner and more efficient basic oxygen furnaces, and it gave only a 25% chance to the possibility that all of the plants using the open hearth process would be shut down (Appendix at 1026a–1027a). Finally, we note that the Administrator has indicated that he has not been furnished with sufficient information from the companies themselves to enable him to consider giving special consideration to the Mahoning Valley, and that "companies contending that the effluent limitation guidelines will cause curtailment of operations and heavy unemployment in the Mahoning Valley area will have the opportunity to present detailed technical, cost and financial information to support this contention." 39 Fed.Reg. 24118. We take the Administrator at his word and expect him to give serious consideration to the Mahoning Valley companies' request for special consideration upon a furnishing of the necessary data.

## V

In this portion of the opinion, we shall discuss several other contentions raised by petitioners which pertain to alleged deficiencies in the process of estab-

---

61. While these developments occurred subsequent to the promulgation of the regulations in question, we believe that we should not close our eyes to such evidence where it has an important bearing on agency assumptions and predictions. See *Amoco Oil Co. v. Environmental Protection Agency,* 163 U.S.App.D.C. 162, 501 F.2d 722, 729 n.10 (1974). While this evidence was not in the nature of sworn testimony, as in *Amoco Oil,* it consisted of the companies' own announcements as to their earnings and plans, and thus can be treated as equally reliable. Furthermore, the petitioners do not contest the accuracy of this evidence.

62. The Kearney Report also concluded that pollution control equipment could be financed through the use of tax-exempt bonds. Appendix at 290a–293a. See 26 U.S.C. § 103(c)(4)(E) & (F).

63. The validity of the water quality standards is not before us in this case. Such standards are more stringent than effluent limitations, since they are intended to maintain water quality where effluent limitations are insufficient. See § 302 of the Act, 33 U.S.C. § 1312.

lishing the effluent limitations. Petitioners first contend that the limitations should have been established on a net rather than a gross basis. Otherwise, they argue, they would be forced to clean up water that had already been polluted by other companies. They further contend that the varying amounts of pollutants in the intake waters often make it impossible to meet effluent limitations which have been established on a gross basis.

We believe that these objections have merit. While we do not think it practical or necessary at this stage to require the recalculation of the limitations to place them all in a net basis, we believe that any individual point source should be entitled to an adjustment in an effluent limitation applicable to it if it can show that its inability to meet the limitation is attributable to significant amounts of pollutants in the intake water. Such an adjustment would seem required by due process, since without it a plant could be subjected to heavy penalties because of circumstances beyond its control. Furthermore, such a plant may risk incurring penalties even though it had installed precisely the same pollution abatement equipment as another plant which, because its intake waters were cleaner, could meet the limitation and thus avoid any fines.

The Administrator has recognized this problem and has proposed regulations specifying those situations in which the Regional Director "may" allow a credit for pollutants already present in the intake waters.[64] While these regulations have not yet been promulgated, the Administrator contended at oral argument that the Regional Directors are in fact making allowances at this time for such pollutants. However, the absence of any final written regulations and of any record evidence as to the basis on which

such allowances are made prevents us from conducting any meaningful judicial review. Considering the importance we give to this problem, we cannot rely on mere oral assurances by the Administrator that allowances are already being made. Furthermore, the Administrator's response to petitioners' comment requesting net limitations appears to indicate that the Regional Administrator would be given some discretion in deciding whether to make an allowance.[65] We believe that the scope of this discretion should be carefully defined and that the Administrator (as well as any state permit-issuing authorities) should be clearly instructed as to those circumstances under which a credit *must* be given. Consequently, we conclude that on remand the regulations should be revised to establish precise guidelines for the making of such allowances.

Petitioners' remaining contentions are without merit. They first contend that the regulations are arbitrary and capricious because the "variance" procedure has not yet been established. It is clear, however, that the Administrator did introduce into the regulations for each subcategory a provision which would allow the permit issuers to modify the effluent limitation applicable to a particular point source upon a showing that the factors relating to that source's ability to comply with the limitations are "fundamentally different from the factors considered in the establishment of the guidelines." Petitioners nevertheless claim that because the Administrator subsequently requested public comment on how the variance provision should be applied and interpreted,[66] the procedure was still not established. While it is true that the variance procedure has not been definitively delineated, we believe it was clearly established and that is an operative part of the regulations. Fur-

---

**64.** 39 Fed.Reg. 24115, comment # 11.

**65.** The Administrator's response was that "the agency is currently developing amendments to its NPDES permit regulations (40 CFR Part 125) which will specify the situations in which

the Regional Administrator *may* allow a credit for the pollutants present in the plant's intake waters." 39 Fed.Reg. 24115, comment # 11 (emphasis added).

**66.** 39 Fed.Reg. 28926 (Aug. 12, 1974).

thermore, we note that, because of our remand for the promulgation of guidelines and the reconsideration of the limitations in light of the base level concept, the flexibility provided by the variance procedure may not necessarily be brought into play.

Petitioners also argue that the Administrator erred in failing to establish the monthly average of effluent loads permissible on a long-term (preferably, a yearly) basis. While conceding that the regulations permit a daily variation of up to three times the monthly average, petitioners contend that the failure to premise a monthly average on a long-term basis does not sufficiently recognize the possibility of monthly variations in effluent discharges that are bound to occur even with the best technology. However, we do not see how the failure to establish a monthly average in this fashion constitutes an abuse of discretion, especially considering the statutory time constraints on the Administrator which would have precluded a year-long sampling effort.

Finally, we reject petitioners' contention that the regulations are invalid because the Administrator failed to use an adequate data base from which to promulgate them. Given the Administrator's clear mandate to press the development of technology,[67] we do not believe it was necessarily an abuse of discretion to base the regulations on results obtained from a few plants which were using the best technology. Rather than invalidate the regulations across the board, we believe it is more appropriate to focus on whether there is record evidence showing that any particular limitation resulting from this data base is

lacking in feasibility. We shall consider that question in part VII of this opinion.

## VI

Thus far, we have been addressing petitioners' various contentions pertaining to the Administrator's promulgation of regulations for existing point sources under sections 301 and 304 of the Act. In this section we shall consider petitioners' challenge to the Administrator's interpretation of his power to promulgate effluent limitations for new point sources under section 306. As noted previously,[68] the existence of the Administrator's power to promulgate such limitations— unlike that of his power to promulgate effluent limitations for existing sources under section 301—is clear and unquestioned. The principal issues here are whether the Administrator erred in adopting standards for new sources which were identical to the existing source standards to be applicable in 1983 and whether he erred in relying on his consideration of the factors enumerated in section 304 to satisfy the requirements of section 306.

The Act refers to three distinct levels of technology which must be attained. For existing sources, the standard to be applicable in 1977 is the "best practicable control technology currently available," or "BPCTCA." The 1983 standard for existing sources is the "best available technology economically achievable," or "BATEA." The standard applicable to new sources is the "best available demonstrated control technology," or "BADCT." It is unquestioned that the 1977 "BPCTCA" is the least stringent of the three. The dispute focuses on the relative degree of stringency between the 1983 "BATEA" standards and the

---

67. The Senate Report stated:
"The Administrator will have the capability and the mandate to press technology and economics to achieve those levels of effluent reduction which he believes to be practicable in the first instance and attainable in the second. . . .
". . . It is acknowledged that in those industrial categories where present practices

are uniformly inadequate, the Administrator may determine best practicable to require higher levels of control than any currently in place if he determines the technology to achieve those higher levels can be practicably applied."
Leg.Hist. at 1460, 1468.

68. *See* note 4 *supra.*

new source "BADCT" standards. The Administrator took the view that these two standards were essentially similar. In his establishment of "BADCT" standards, he merely incorporated by reference the relevant "BATEA" standards. The only independent analysis he conducted in defining "BADCT" levels was to determine as required by section 306, whether a "zero discharge" level was "practicable." Since he determined in each case that a "zero discharge" level for new sources was not practicable, he merely adopted the "BATEA" standards. Petitioners, however, contend that the new source standards should be less stringent than the 1983 "BATEA" standards, since the Act requires that the new source standards be "demonstrated" and that they be achievable now rather than by 1983.

■■■ We reject petitioners' contention that it was necessarily error for the Administrator to equate the two standards. While it is true that the new source standards, unlike the 1983 standards for existing sources, must be based on technology whose present availability is "demonstrated," it is clear that Congress did not intend by that phrase to limit the technology to that which is widely in use. As the House Report stated:

> "It will be sufficient, for the purpose of setting the level of control under available technology, that there be one operating facility which demonstrates that the level can be achieved or that there is sufficient information and data from a relevant pilot plant or semi-work plant to provide the needed economic and technical justification for such new source." [69]

Furthermore, Congress was clearly appreciative of the fact that the most effective and least expensive approach to water pollution would be to prevent new water pollution problems by requiring "maximum feasible control of new

sources, at the time of their construction." [70] Thus, Congress recognized that new sources could attain discharge levels more easily and at less cost than existing sources which must be retrofitted. As the House Report stated:

> "In section 306, the Committee recognizes two of the most significant factors in the attainment of clean water. These factors are (1) the need to preclude the construction of new sources or the modification of existing sources which use less than the best available control technology for the reduction or elimination of the discharge of pollutants, and (2) the recognition of the significantly lower expense of attaining a given level of effluent control in a new facility as compared to the future cost of retrofitting a facility to meet stringent water pollution control measures." [71]

This awareness of the lower costs that would be incurred by new sources led Congress to require that less weight be given to costs under section 306 than under section 304. As Senator Muskie stated with reference to the Administrator's requirement to consider costs under section 306:

> "The Conferees would expect that this cost test would be considerably more restrictive than the test which would be applied to 'best available technology' because pollution control alternatives are available to a new source which are not available to existing sources." [72]

■■■ In sum, given Congress' clearly expressed belief that it would be easier for new sources to attain a particular level of effluent control than it would be for existing sources, and given the fact that the Administrator was permitted to rely on pilot projects (or "transfer tech-

---

**69.** Leg.Hist. at 798.

**70.** *Id.* at 1476 (Senate Committee Report).

**71.** Leg.Hist. at 797.

**72.** *Id.* at 172.

nology")[72a] to determine whether a particular standard was "demonstrated," we do not believe that it was arbitrary or an abuse of discretion for the Administrator to equate the "BADCT" levels for new sources with the "BATEA" levels for existing sources. The fact that Congress anticipated that new sources could achieve particular effluent limitations more easily than existing sources points in the direction of *greater* stringency for new source standards and counter-balances somewhat the requirement that technology for new sources be "demonstrated"—a requirement which, as we have seen, can be met through reliance on pilot projects. We thus conclude that it was not necessary for the Administrator to conduct a separate study of technology for new sources and that he acted within the permissible scope of his discretion in relying on the portions of the Final Development Document which discuss the "BATEA" standards.[73] Rather than invalidate the section 306 limitations totally, we believe it is more appropriate to examine each one being challenged to determine whether the record supports the Administrator's conclusion that the standard has been "demonstrated."

▮▮▮ Petitioners also contend that the Administrator failed to consider factors which section 306 required him to consider in establishing new source standards. These factors are basically the same as those which must be considered under section 304, with one obvious and notable exception—the factor of age. Since we concluded in part IV of this opinion that age was the only factor that the Administrator did not sufficiently consider,[74] and since we have held that the consideration that went into the existing source standards could properly be relied on as a basis for the new source standards, part IV of this opinion controls petitioners' contentions here. We believe it is appropriate to make only one further comment. Petitioners contend that the Administrator failed "to make the requisite cost/benefit analysis." However, no cost/benefit analysis is required under section 306. Rather, the Administrator is required only to take costs "into consideration." This language is virtually identical to that appearing in section 304(b)(2)(B), which requires the Administrator to take costs "into account" in assessing "BATEA" levels and which is distinct from the limited cost/benefit analysis required in section 304(b)(1)(B). Furthermore, as can be seen from the quotation of Senator Muskie in the text accompanying footnote 72 of this opinion, cost was to be given even less weight under section 306 than for existing sources.

## VII

In this section of the opinion we consider petitioners' arguments that the specific limitations for both new and existing point sources are too stringent. It is first necessary to explain how our consideration of these contentions is affected by our earlier discussion. With respect to the new source standards promulgated under section 306, we found no error in the process by which those stan-

---

**72a.** "Transfer technology" refers to technology which has been developed in one process or industry but which the Administrator believes can be successfully "transferred" to other processes or industries which operate under similar conditions.

**73.** We thus reject as frivolous petitioners' contention that "the entire study of the new source standards of performance comprises only five pages of the final development document prepared to support the Regulations," since the study underlying the "BATEA" levels served also as the basis for the "BADCT" levels.

**74.** In part IV(c) of this opinion, we concluded that, while CF&I could not raise in this petition the Administrator's failure to consider the evaporation problem, it could do so on remand in the context of the proceedings spelled out in part III of this opinion. Since we see no error in the establishment of the § 306 limitations which would require remand to reconsider those limitations in their totality, CF&I will be unable to raise the evaporation problem with respect to any new sources it may be planning to construct.

dards were formulated. The only error we found regarding the existing source limitations which would also affect the new source standards was the failure to give a credit where noncompliance was attributable to pollutants in the intake waters. While remand of the section 306 limitations is required so that the regulations can be redrafted to provide for credits as required in part V of this opinion, there is no need on remand to reconsider those limitations themselves across the board. Consequently, it is essential that we consider the technological challenges to the new source standards at this time.

With respect to the existing source standards, we have previously indicated that, in addition to the necessity to promulgate regulations pertaining to credits where the intake waters are polluted, remand is necessary to promulgate guidelines under section 304, to reconsider the limitations in light of the "base level" and "ceiling" concepts and to consider more fully the factor of age. See parts III and IV(A) of this opinion. In many cases, it might be preferable to defer considering the technological challenges to existing source limitations until the proceedings on remand are completed, since the limitations might be relaxed somewhat in light of the "base level" and "ceiling" concepts. We believe, however, that it is appropriate to consider them now. As a matter of judicial economy, and given Congress' desire to move expeditiously in attacking the problems of water pollution, we do not think it would be advisable to postpone consideration of the technological challenges until the remand proceedings are completed several months hence. Furthermore, we note that the challenges to the 1977 "BPCTCA" levels of technology are very few in number, and the challenges to the 1983 "BATEA" standards

are of a general rather than specific nature. Finally, we note that under petitioners' own construction of the statute, any limitation which is sufficiently "demonstrated" to be a valid new source standard must also be a valid 1983 "BATEA" limitation. Thus, our consideration of the technological challenges to the new source standards (which we must make) will necessarily have considerable bearing on the validity of the 1983 "BATEA" standards. We emphasize, however, that our holding that whether limitations have been sufficiently demonstrated for purposes of "BATEA" and "BPCTCA" standards merely means that those limitations represent achievable points within a feasible range and that the Administrator must not automatically assume that the present limitations can represent permissible "ceilings."

### A: The 1977 "BPCTCA" Limitations

 Petitioners challenge the 1977 limitations with respect to only two subcategories: by-product coke and sintering. They make two points regarding the by-product coke limitations. First, they contend that an effluent "flow rate"[74a] of 175 gallons per ton of coke produced was unrealistic, and assert that the Administrator disregarded evidence that a 300 gallon per ton flow rate was the best practicable. However, two of the four by-product coke plants surveyed (plants A and B) were attaining a flow rate less than the 175 gallon per ton level. Furthermore, petitioners' recommendation of a 300 gallon per ton flow rate follows that of the "Koppers Report," which recommended a flow rate which had been doubled through a 1:1 dilution.[74b] Neither petitioners nor the Koppers Report explain why such a dilution is necessary, and the undiluted flow rate recommended by Koppers would be

---

**74a.** The "flow rate" refers to the amount of waste water discharged (in terms of gallons) for each ton of product (e. g., coke or steel) produced. Since the limitations are expressed in terms of pounds of pollutants per 1000 pounds of product and are derived from a mul-

tiplication of flow and concentration, trade-offs can occur between flow and concentration provided the limitation is not exceeded.

**74b.** This figure means one part fresh water added to each part of waste water.

less than 175 gallons per ton. Under these circumstances, we cannot conclude that the Administrator's figure of 175 gallons per ton was "arbitrary" or "capricious."

■ Petitioners' second point is that the 1977 limitations regarding ammonia discharge from by-product coke plants are without support. Petitioners contend that use of a bio-oxidation facility as recommended by the Administrator will actually increase the amount of ammonia in the effluent. However, biological treatment is only one of two alternative treatment systems. Two of the other plants surveyed which used the other treatment alternative (one which provides for physical and chemical treatment) achieved the effluent limitation. So long as the limitation can be achieved through the use of one of the alternatives, it is valid. Furthermore, even in the one plant using the bio-oxidation process, ammonia was removed from the waste water at a rate of 28.8% (Appendix at 1469a), thus undercutting petitioners' claim that the process increased ammonia discharge. While that removal rate was not sufficient to meet the 1977 "BPCTCA" limitation, the Administrator noted that the plant "was not employing the ammonia removal step ahead of the biological system as proposed in the treatment schematic." [75]

■ Petitioners' challenge to limits in the sintering subcategory is based on the fact that the sampled plants had a wet cleaning system only on the "deduster" end, whereas the limitations were applicable to sintering plants with wet cleaning systems on both the "deduster" and the "wind-box." They therefore contend that the limitations were based on unrepresentative plants and were thus too restrictive. The Administrator responds by claiming that any sinter plant with wet systems on both ends can obtain a variance under 40 C.F.R. § 430.32 on the

ground that such plants operate under conditions "fundamentally different" than the tested plants. This response is satisfactory to us and would appear to fully meet petitioners' objection.[76] We thus reject all of petitioners' challenges to the "BPCTCA" limitations.

## B: *The 1983 "BATEA" Limitations*

■ As noted previously, petitioners' objections to the 1983 "BATEA" standards are very general. Essentially, they repeat their allegations with respect to the new source standards, which are discussed in part VII(C) of this opinion. They also contend that reliance on transfer technology was improper. However, given the Act's mandate to the Administrator to press the development of technology,[77] reliance on transfer technology was clearly proper. As Senator Muskie stated:

"The distinction between 'best practicable' and 'best available' is intended to reflect the need to press toward increasingly higher levels of control in six-year stages. Through the research and development of new processes, modifications, replacement of obsolete plans and processes, and new improvements in technology, it is anticipated that it should be possible, taking into account the cost of controls, to achieve by 1983 levels of control which approach and achieve the elimination of the discharge of pollutants." [78]

Furthermore, since we have concluded that reliance on pilot plant technology was proper in establishing limitations for new sources, it should also be proper in establishing 1983 "BATEA" limitations for existing sources.

■ Finally, petitioners contend that because the 1983 standards are not to be applicable for another eight years and because they were published under severe time pressures and were based on

---

75. 39 Fed.Reg. 24116 (comment #22).

76. Petitioners make the same contention, and the Administrator makes the same response, with respect to the new source standards. We believe the response is equally sufficient there.

77. *See* note 67 *supra* and accompanying text.

78. Leg.Hist. at 170.

"guesswork," they should be remanded for more careful consideration. As petitioners acknowledge, however, the Act contemplates that the section 301 limitations be reviewed "at least every five years." [79] We believe it is premature for petitioners to insist on such review now. Rather, we believe that the Act contemplates a period of a few years after which the accuracy of the Administrator's evaluations and projections can be reviewed in the light of actual experience.

### C: *The New Source Standards*

■ 1. *Flow Rates.*—Petitioners first challenge the 100 gallon per ton flow rate for new by-product coke plants. As noted previously, we are satisfied that the Administrator did not act arbitrarily and capriciously in using a 175 gallon per ton flow rate for 1977 "BPCTCA" limitations in the by-product coke subcategory. However, we agree with petitioners that a 100 gallon per ton flow rate has not been "demonstrated." None of the sampled plants achieved such a flow rate, and the Administrator has not pointed to any transfer technology indicating that such a flow rate is achievable for by-product coke. The Administrator instead relies on the Koppers Report, claiming that the Report's recommendation supports a 100 gallon per ton rate. The Koppers Report, however, merely makes a recommendation, and even that is for a 300 gallon per ton rate. Even if the Administrator is correct in saying that a 1:1 dilution is not necessary and that certain effluents were improperly included in the Koppers Report, we do not believe that the "recommendation" there can satisfy the requirement in section 306 that the technology be "demonstrated." We see no evidence in the record that an actual plant—pilot project or otherwise—has achieved a 100 gallon per ton flow rate. Thus, the new source standards for by-

product coke should be reconsidered in light of a new and "demonstrated" flow rate.[80]

■ Petitioners also contend that the flow rates for the sintering, blast furnace, basic oxygen furnace ("BOF") and continuous casting subcategories were not supported by the record. Petitioners contend that the flow rates have not been demonstrated, but were based on the Administrator's belief as to the viability of "recycle systems." Petitioners contend that such systems are not viable because of problems of plugging, scaling and corrosion. While the evidence in the record as to the severity of the plugging and scaling problem is quite sketchy, we believe that petitioners have raised a valid point and that remand is appropriate for further consideration of this problem. In the sintering subcategory, for example, the "BATEA" and "BADCT" flow rates were set at 50 gallons a ton, but the only plant on which full data were obtained (Plant J, which already used a recycle system) had a flow rate of 114 gallons per ton. In the Final Development Document, the Administrator concluded that this figure was "excessive" and could be reduced by more than 50 per cent simply by "tightening up the recycle loop." However, he then noted: "In doing this, more attention may have to be paid to control of heat buildup and scaling and/or corrosive conditions in the recycle systems." [81] This strikes us as a virtual confession that it has not been "demonstrated" that a 50 gallon per ton flow rate can be achieved in the absence of scaling and corrosion. Furthermore, petitioners contended in a submission to the Administrator that "even with the 114 gallon/ton Plant 'J' has abandoned approximately 90% of the wet system because of excessive scaling." (Appendix at 1111a). If this fact is true, it would raise serious questions as to whether the viability of recycle systems has been demonstrated.

**79.** Section 301(d), 33 U.S.C. § 1311(d).

**80.** Similarly, we see no evidence that the technology for achieving such a flow rate is "available" within the meaning of § 301(b)(2)(A), and thus we likewise remand for further consideration of the BATEA limitations for by-product coke.

**81.** Final Development Document at 336 and 387 (Appendix at 1599a and 1650a).

The Administrator, however, relied on transfer technology from the Open Hearth and BOF recycle systems, which had actually achieved flow rates of 50 gallons per ton. He concluded that "the technology should be readily transferable to a sinter plant, since the type of recycle system and many of the aqueous contaminants are identical." [82] Petitioners contend that, at least with respect to the BOF process, the surveyed plants did not show that a 50 gallon per ton flow rate could be achieved in the absence of plugging problems. While Plant "S" attained a flow rate of 52.2 gallons per ton,[83] petitioners contend that that plant used an "off gas" (or "OG") system which treated less gas and did not become as hot as a typical BOF system. Thus, they assert that there was less evaporation and consequently a smaller build-up of solids that would cause plugging. They further contend that there are only two OG systems in the country.[84] We see no evidence that the Administrator in his response to petitioners' comments [85] considered whether the lack of plugging and scaling in Plant "S" (which did not meet the 50 gallon per ton rate anyway) was attributable to its use of an OG system, which might make it unrepresentative of the BOF subcategory.

The Administrator also relies on the results obtained from Plant "V," another BOF plant, which allegedly attained a flow rate of 33 gallons per ton [86] through use of a typical treatment system. Petitioners contended below that the flow rate must have been merely an estimate, since no water flow measurements could be found in the EPA contractor's report. They further contended that recent flow

measurements at the plant showed that the actual water use was more than twice the figure used by the contractor, and that such higher water use was necessary to prevent plugging problems.[87] The Administrator responded to this by asserting that "other information available to the agency indicates that the actual rate is less than 250.3 1/kkg (60 gallons per ton) and also that the plugging problems resulted not from operating the BOF scrubber portion of this multi-purpose system at the design rate, but due to problems in the other part of the systems." [88] However, the Administrator never specified what this "other information" was. In light of his failure to do so, meaningful judicial review of his conclusion is impossible.

We thus believe that there are a number of serious questions concerning the viability of recycle systems as they pertain to the sintering and BOF subcategories. With respect to the blast furnace and continuous casting subcategories, we are satisfied from the record that the "BATEA" and "BADCT" flow rates of 125 gallons per ton were demonstrated,[89] and petitioners have pointed to no record evidence of plugging or scaling in those plants. The Administrator may, of course, rely on transfer technology in establishing the flow rates for the sintering and BOF subcategories. However, in view of the questions that have been raised, we believe that remand is necessary so that the Administrator can more fully consider the plugging and scaling problem and can more fully articulate the reasoning for his conclusion that the 50 gallon per ton flow rates for the sintering and BOF subcategories have been "demonstrated." [90]

---

82. *Id.*

83. *Id.* at 218 (Appendix at 1496a).

84. Appendix at 1114a.

85. 39 Fed.Reg. 24115 (comment # 10).

86. Final Development Document at 226, Appendix at 1501a.

87. Appendix at 1115a.

88. Fed.Reg. 24115 (comment # 10). Furthermore, his response still does not indicate

whether a *50* (rather than a 60) gallon per ton flow rate was demonstrated.

89. *Id.* (comment # 13).

90. With respect to petitioners' contention that the flow rates were established based on a sintering plant having a wet scrubber system only on the "dedusting" end, we have already indicated that plants having scrubbers on both ends would be entitled to a variance if they show that their inability to achieve the flow rate is attributable to their "fundamentally dif-

2. *The Limitations.*—Petitioners challenge the BADCT standards for by-product coke on the ground that neither of the two alternative technologies relied upon to achieve the standards have been "demonstrated." While we tend to agree with petitioners that one of the two alternatives (the "multistage" biological treatment systems) has not been demonstrated,[91] we are satisfied that the second alternative, which utilizes "alkaline" (or "breakpoint") chlorination and "carbon adsorption," has been sufficiently demonstrated. As long as there is one demonstrated method of attaining the limitation, the limitation is valid.

Petitioners' challenge to the alkaline chlorination process is basically two-fold: that it has never been demonstrated on by-product coke wastes, and that the chlorination process gives off chlorinated organics which are potentially more dangerous than the pollutants sought to be removed. With respect to the first point, the Administrator relied on transfer technology from other industries (particularly the electroplating and water treating industries),[92] and petitioners have pointed to no evidence why such transfer would not be appropriate. Furthermore, petitioners admit that alkaline chlorination has been demonstrated on blast furnace effluent in a "once-through" system[93] but contend, without pointing to any evidence in support of their view, that such a process would not work in a recycled system.[94]

With respect to the problem created by chlorinated organics, the Admin-

istrator responds that the addition of the carbon adsorption process after chlorination was prescribed specifically to remove such chlorinated organics. Furthermore, carbon adsorption has been applied on a large-scale basis in the petroleum industry for years,[95] and petitioners have pointed to no evidence indicating that the use of such transfer technology is inappropriate. In the absence of such evidence, we cannot say that the reliance on such transfer technology was arbitrary or an abuse of discretion.

Petitioners' next challenge is to the "BATEA" and "BADCT" limitations for suspended solids in the continuous casting subcategory. However, an examination of the record shows that one plant (Plant "AE") clearly achieved the limitations. Petitioners contend that the results from that plant are not achieved on a continuous basis and thus did not reflect the varying characteristics of the intake waters. We have already held, however, that the Administrator must make a provision in the regulations which entitles a point source to a credit when it shows that its inability to meet an effluent limitation is attributable to substances in the intake waters. See part V of this opinion. We believe that such a provision would meet petitioners' objection to this limitation and would protect them from the imposition of penalties because of circumstances beyond their control.

Petitioners also challenge the "BATEA" and "BADCT" suspended solid limitations for the BOF and vacuum degassing subcategories, contending that

---

ferent" characteristics. *See* part VII(A) of this opinion, at text accompanying note 76 *supra.*

**91.** Our skepticism as to the Administrator's belief that this technology has been demonstrated is based on the rather equivocal support for that alternative given in the Final Development Document itself, which stated that such treatment was "possible" (Appendix at 1467a). Furthermore, the Administrator's reliance on transfer technology involving nitrification and denitrification processes (based on demonstrated success of nitrogen removal from municipal wastes) seems inconsistent with his recognition that a transfer of the bio-

logical denitrification process from municipal waste treatment to the open hearth and vacuum degassing subcategories was inappropriate. See 39 Fed.Reg. 24118 (comment # 7).

**92.** 39 Fed.Reg. 6495.

**93.** Plant L, Final Development Document at 203 (Appendix at 1486a).

**94.** For this reason, we also reject petitioners' challenge to the "BADCT" limitations established for the blast furnace subcategory.

**95.** 39 Fed.Reg. 6495.

the technology for achieving those limitations has not been demonstrated. After examining the record, however, we are satisfied that the achievability of a 25 mg/1 limitation has been demonstrated for the BOF subcategory. Two plants in the BOF subcategory achieved limitations of 23 and 26 mg/1.[96] However, none of the vacuum degassing plants surveyed appears to have achieved this limitation. Rather, the Final Development Document merely states that all the critical parameters in the vacuum degassing operations were found to be the same as those for the open hearth subcategory.[97] However, none of the open hearth plants achieved the limitation either. The Final Development Document judged the performance of the surveyed open hearth plants to be "uniformly inadequate" and stated: "As with the similarly operated BOF wet recycle systems, less than 25 mg/1 suspended solids can readily be achieved."[98] This statement may be supportable, but we hesitate to accept such a conclusory statement on this record, at least insofar as it is relied on to support the limitation for the vacuum degassing subcategory. This is a reliance on a transfer on top of a transfer, without any explanation, and the ultimate source of this transfer twice removed—the BOF subcategory—establishes a valid limitation only if the flow rate can be termed "demonstrated."[99] Thus, we believe the Administrator should be required to explain in more detail why the reliance on transfer technology is permissible in establishing the "BATEA" and "BADCT" limitations for suspended particles in the vacuum degassing category.

Finally, petitioners challenge the 20 mg/1 fluoride limitation for the BOF subcategory. The one BOF plant studied had what was equivalent to a 63 mg/1 fluoride discharge.[100] However, the Administrator adopted the same approach as he did in the sintering subcategory[101] and concluded that the limitation could be met by "lime precipitation" of fluoride, a technology deemed "readily transferable" from raw waste treating plants to waste-water treatment in the steel industry.[102] Petitioners claim that this "theoretically" transferable technology fails to give consideration to a number of factors, but cites no record evidence as to their importance and offers no convincing explanation as to why the fluoride treatment technology, which has been successfully used on a full-scale basis in other industries, is not easily transferable to the BOF process.

In addition to challenging the above limitations as not being demonstrated, petitioners contend that no *justification* has been given for the 20 mg/1 fluoride limitation in the sintering, blast furnace, BOF, open hearth and electric arc subcategories, or for the 5 mg/1 zinc limitation in the open hearth, electric arc and vacuum degassing subcategories. However, it appears that these two elements were both present in the discharge of existing plants in those subcategories, and thus it was reasonable to assume that they would also be present in the discharge of new sources using the same raw materials. The Final Development Document also discusses the adverse environmental impact of fluoride and zinc.[103] However, the Administrator admits that "there is some evidence that zinc ions are adsorbed strongly and permanently in silt, resulting in inactivation of the zinc."[104] In light of this admitted evidence, we believe that the Adminis-

---

96. Final Development Document at 404, Appendix at 1667a. This limitation, however, is based on a flow rate of 50 gallons per ton and thus may not be valid if, on remand, the evidence shows that the plugging and scaling problems are of such magnitude that the viability of recycle systems cannot be termed "demonstrated."

97. Final Development Document at 410, Appendix at 1673a.

98. *Id.* at 405, Appendix at 1668a.

99. *See* note 96 *supra*.

100. Final Development Document at 404, Appendix at 1667a.

101. *Id.* at 388, Appendix at 1651a.

102. *Id.*

103. *Id.* at 159–61, Appendix at 1452a–54a.

104. *Id.* at 160, Appendix at 1453a.

trator should explain more fully why a zinc limitation is necessary.

## VIII

Accordingly, the matter will be remanded to the Environmental Protection Agency for further proceedings consistent with this opinion.[105]

## ADDENDUM

Relevant parts of the Federal Water Pollution Control Act Amendments of 1972, 86 Stat. 816, 33 U.S.C. § 1251, et seq. [Those portions which are of special importance have been italicized for emphasis.]

## SECTION 101

§ 1251. Congressional declaration of goals and policy.

(a) The objective of this chapter is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. In order to achieve this objective it is hereby declared that, consistent with the provisions of this chapter—

(1) it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985;

(2) it is the national goal that wherever attainable, an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water be achieved by July 1, 1983;

(3) it is the national policy that the discharge of toxic pollutants in toxic amounts be prohibited;

(4) it is the national policy that Federal financial assistance be provided to construct publicly owned waste treatment works;

(5) it is the national policy that areawide waste treatment management planning processes be developed and implemented to assure adequate control of sources of pollutants in each State; and

(6) it is the national policy that a major research and demonstration effort be made to develop technology necessary to eliminate the discharge of pollutants into the navigable waters, waters of the contiguous zone, and the oceans.

(b) It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter. It is further the policy of the Congress to support and aid research relating to the prevention, reduction, and elimination of pollution and to provide Federal technical services and financial aid to State and interstate agencies and municipalities in connection with the prevention, reduction, and elimination of pollution.

\*　　\*　　\*　　\*　　\*　　\*

## SECTION 301

§ 1311. Effluent limitations.

(a) Illegality of pollutant discharges except in compliance with law.

Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful.

(b) Timetable for achievement of objectives.

In order to carry out the objective of this chapter *there shall be achieved*—

(1)(A) *not later than July 1, 1977, effluent limitations for point sources*, other than publicly owned treatment works, (i) which shall require the application of the *best practicable control technology currently available* as defined by the Administrator pursuant to section 1314(b) of this title, or (ii) in the case of a discharge into a publicly

---

**105.** We also deny as moot the stay sought by petitioners' pending appeal.

owned treatment works which meets the requirements of subparagraph (B) of this paragraph, which shall require compliance with any applicable pretreatment requirements and any requirements under section 1317 of this title; and

(B) for publicly owned treatment works in existence on July 1, 1977, or approved pursuant to section 1283 of this title prior to June 30, 1974 (for which construction must be completed within four years of approval), effluent limitations based upon secondary treatment as defined by the Administrator pursuant to section 1314(d)(1) of this title; or,

(C) not later than July 1, 1977, any more stringent limitation, including those necessary to meet water quality standards, treatment standards, or schedules of compliance, established pursuant to any State law or regulations (under authority preserved by section 1370 of this title) or any other Federal law or regulation, or required to implement any applicable water quality standard established pursuant to this chapter.

(2)(A) *not later than July 1, 1983, effluent limitations for categories and classes of point sources*, other than publicly owned treatment works, which (i) shall require application of the *best available technology economically achievable* for such category or class, which will result in reasonable further progress toward the national goal of eliminating the discharge of all pollutants, as determined in accordance with regulations issued by the Administrator pursuant to section 1314(b)(2) of this title, which such effluent limitations shall require the elimination of discharges of all pollutants if the Administrator finds, on the basis of information available to him (including information developed pursuant to section 1325 of this title), that such elimination is technologically and economically achievable for a category or class of point sources as determined in accordance with regulations

issued by the Administrator pursuant to section 1314(b)(2) of this title, or (ii) in the case of the introduction of a pollutant into a publicly owned treatment works which meets the requirements of subparagraph (B) of this paragraph, shall require compliance with any applicable pretreatment requirements and any other requirement under section 1317 of this title; and

(B) not later than July 1, 1983, compliance by all publicly owned treatment works with the requirements set forth in section 1281(g)(2)(A) of this title.

(c) Modification of timetable.

*The Administrator may modify the requirements of subsection (b)(2)(A) of this section* with respect to any point source for which a permit application is filed after July 1, 1977, upon a showing by the owner or operator of such point source satisfactory to the Administrator that such modified requirements (1) will represent the maximum use of technology within the economic capability of the owner or operator; and (2) will result in reasonable further progress toward the elimination of the discharge of pollutants.

(d) Review and revision of effluent limitations.

Any effluent limitation required by paragraph (2) of subsection (b) of this section shall be reviewed at least every five years and, if appropriate, revised pursuant to the procedure established under such paragraph.

(e) All point discharge source application of effluent limitations.

*Effluent limitations established pursuant to this section* or section 1312 of this title shall be applied to all point sources of discharge of pollutants in accordance with the provisions of this chapter.

(f) Illegality of discharge of radiological, chemical, or biological warfare agents or high-level radioactive waste.

Notwithstanding any other provisions of this chapter it shall be unlawful to discharge any radiological, chemical, or biological warfare agent or high-level radioactive waste into the navigable waters. (June 30, 1948, ch. 758, Title III, § 301, as added Oct. 18, 1972, Pub.L. 92–500, § 2, 86 Stat. 844.)

SECTION 302

§ 1312. Water quality related effluent limitations.

(a) Whenever, in the judgment of the Administrator, discharges of pollutants from a point source or group of point sources, with the application of effluent limitations required under section 1311(b)(2) of this title, would interfere with the attainment or maintenance of that water quality in a specific portion of the navigable waters which shall assure protection of public water supplies, agricultural and industrial uses, and the protection and propagation of a balanced pollution of shellfish, fish and wildlife, and allow recreational activities in and on the water, effluent limitations (including alternative effluent control strategies) for such point source or sources shall be established which can reasonably be expected to contribute to the attainment or maintenance of such water quality.

(b)(1) Prior to establishment of any effluent limitation pursuant to subsection (a) of this section, the Administrator shall issue notice of intent to establish such limitation and within ninety days of such notice hold a public hearing to determine the relationship of the economic and social costs of achieving any such limitation or limitations, including any economic or social dislocation in the affected community or communities, to the social and economic benefits to be obtained (including the attainment of the objective of this chapter) and to determine whether or not such effluent limitations can be implemented with available technology or other alternative control strategies.

(2) If a person affected by such limitation demonstrates at such hearing that (whether or not such technology or other alternative control strategies are available) there is no reasonable relationship between the economic and social costs and the benefits to be obtained (including attainment of the objective of this chapter), such limitation shall not become effective and the Administrator shall adjust such limitation as it applies to such person.

(c) *The establishment of effluent limitations under this section shall not operate to delay the application of any effluent limitation established under section 1311 of this title.* (June 30, 1948, ch. 758, Title III, § 302, as added Oct. 18, 1972, Pub.L. 92–500, § 2, 86 Stat. 846.)

SECTION 304

§ 1314. Information and guidelines.

(a) Criteria development and publication.

\* \* \* \* \* \*

(b) Effluent limitation guidelines.

For the purpose of adopting or revising effluent limitations under this chapter the Administrator shall, after consultation with appropriate Federal and State agencies and other interested persons, publish within one year of October 18, 1972, regulations, *providing guidelines for effluent limitations* and, at least annually thereafter, revise, if appropriate, such regulations. Such regulations shall—

(1)(A) *identify*, in terms of amounts of constituents and chemical, physical, and biological characteristics of pollutants, *the degree of effluent reduction attainable through the application of the best practicable control technology currently available for classes and categories of point sources* (other than publicly owned treatment works); and

(B) *specify factors to be taken into account in determining the control measures and practices to be applicable to point sources* (other than publicly owned treatment works) *within such categories or classes.* Factors relating to the assessment of best practicable control technology currently

available to comply with subsection (b)(1) of section 1311 of this title shall include consideration of the total cost of application of technology in relation to the effluent reduction benefits to be achieved from such application, and shall also take into account the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques, process changes, non-water quality environmental impact (including energy requirements), and such other factors as the Administrator deems appropriate;

(2)(A) *identify*, in terms of amounts of constituents and chemical, physical, and biological characteristics of pollutants, *the degree of effluent reduction attainable through the application of the best control measures and practices achievable* including treatment techniques, process and procedure innovations, operating methods, and other alternatives for classes and categories of point sources (other than publicly owned treatment works); and

(B) *specify factors to be taken into account in determining the best measures and practices available to comply with subsection (b)(2) of section 1311 of this title to be applicable to any point source* (other than publicly owned treatment works) *within such categories or classes.* Factors relating to the assessment of best available technology shall take into account the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques, process changes, the cost of achieving such effluent reduction, non-water quality environmental impact (including energy requirements), and such other factors as the Administrator deems appropriate; and

(3) identify control measures and practices available to eliminate the discharge of pollutants from categories and classes of point sources, taking into account the cost of achieving such elimination of the discharge of pollutants.

\* \* \* \* \* \*

## SECTION 306

§ 1316. National standards of performance.

(a) Definitions.

For purposes of this section:

(1) The term "standard of performance" means a standard for the control of the discharge of pollutants which reflect the greatest degree of effluent reduction which the Administrator determines to be achievable through application of the best available demonstrated control technology, processes, operating methods, or other alternatives, including, where practicable, a standard permitting no discharge of pollutants.

(2) The term "new source" means any source, the construction of which is commenced after the publication of proposed regulations prescribing a standard of performance under this section which will be applicable to such source, if such standard is thereafter promulgated in accordance with this section.

\* \* \* \* \* \*

(b) Categories of sources; Federal standards of performance for new sources.

(1)(A) The Administrator shall, within ninety days after October 18, 1972, publish (and from time to time thereafter shall revise) a list of categories of sources, which shall, at the minimum, include:

\* \* \* \* \* \*

iron and steel manufacturing;

\* \* \* \* \* \*

(B) As soon as practicable, but in no case more than one year, after a category of sources is included in a list under subparagraph (A) of this paragraph, the Administrator shall propose and publish regulations establishing Federal standards of performance for new sources within such category. The Administrator shall afford interested persons an opportunity for written comment on such proposed regulations. After considering such comments, he shall promulgate,

within one hundred and twenty days after publication of such proposed regulations, such standards with such adjustments as he deems appropriate. The Administrator shall, from time to time, as technology and alternatives change, revise such standards following the procedure required by this subsection for promulgation of such standards. Standards of performance, or revisions thereof, shall become effective upon promulgation. In establishing or revising Federal standards of performance for new sources under this section, the Administrator shall take into consideration the cost of achieving such effluent reduction, and any non-water quality environmental impact and energy requirements.

(2) The Administrator may distinguish among classes, types, and sizes within categories of new sources for the purpose of establishing such standards and shall consider the type of process employed (including whether batch or continuous).

(3) The provisions of this section shall apply to any new source owned or operated by the United States.

\* \* \* \* \* \*

SECTION 316

§ 1326. Thermal discharges.

\* \* \* \* \* \*

(b) Cooling water intake structures.

*Any standard established pursuant to section 1311* of this title or section 1316 of this title and applicable to a point source shall require that the location, design, construction, and capacity of cooling water intake structures reflect the best technology available for minimizing adverse environmental impact.

(c) Period of protection from more stringent effluent limitations following discharge point source modification commenced after October 18, 1972.

Notwithstanding any other provision of this chapter, any point source of a discharge having a thermal component, the modification of which point source is commenced after October 18, 1972, and

which, as modified, *meets effluent limitations established under section 1311 of this title* or, if more stringent, effluent limitations established under section 1313 of this title and which effluent limitations will assure protection and propagation of a balanced, indigenous population of shellfish, fish, and wildlife in or on the water into which the discharge is made, shall not be subject to any more stringent effluent limitation with respect to the thermal component of its discharge during a ten year period beginning on the date of completion of such modification or during the period of depreciation or amortization of such facility for the purpose of section 167 or 169 (or both) of Title 26, whichever period ends first. (June 30, 1948, ch. 758, title III, § 316, as added Oct. 18, 1972, Pub.L. 92–500, § 2, 86 Stat. 876.)

SECTION 401

§ 1341. Certification.

(a) Compliance with applicable requirements; application; procedures; license suspension.

(1) Any applicant for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities, which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate, or, if appropriate, from the interstate water pollution control agency having jurisdiction over the navigable waters at the point where the discharge originates or will originate, that any such discharge will comply with the applicable provisions of sections 1311, 1312, 1316, and 1317 of this title. *In the case of any such activity for which there is not an applicable effluent limitation or other limitation under sections 1311(b)* and 1312 of this title, and there is not an applicable standard under sections 1316 and 1317 of this title, *the State shall so certify*, except that any such certification shall not be deemed to satisfy section 1371(c) of this title. Such State or

interstate agency shall establish procedures for public notice in the case of all applications for certification by it and, to the extent it deems appropriate, procedures for public hearings in connection with specific applications. In any case where a State or interstate agency has no authority to give such a certification, such certification shall be from the Administrator. If the State, interstate agency, or Administrator, as the case may be, fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request, the certification requirements of this subsection shall be waived with respect to such Federal application. No license or permit shall be granted until the certification required by this section has been obtained or has been waived as provided in the preceding sentence. No license or permit shall be granted if certification has been denied by the State, interstate agency, or the Administrator, as the case may be.

\* \* \* \* \* \*

SECTION 402

§ 1342. National pollutant discharge elimination system.

(a) Permits for discharge of pollutants.

(1) Except as provided in sections 1328 and 1344 of this title, the Administrator may, after opportunity for public hearing, issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding section 1311(a) of this title, *upon condition that such discharge will meet either all applicable requirements under sections 1311,* 1312, 1316, 1317, 1318, and 1343 of this title, or prior to the taking of necessary implementing actions relating to all such requirements, such conditions as the Administrator determines are necessary to carry out the provisions of this chapter.

(2) The Administrator shall prescribe conditions for such permits to assure compliance with the requirements of paragraph (1) of this subsection, including conditions on data and information collection, reporting, and such other requirements as he deems appropriate.

(3) The permit program of the Administrator under paragraph (1) of this subsection, and permits issued thereunder, shall be subject to the same terms, conditions, and requirements as apply to a State permit program and permits issued thereunder under subsection (b) of this section.

\* \* \* \* \* \*

(b) State permit programs.

At any time after the promulgation of the guidelines required by subsection (h)(2) of section 1314 of this title, the Governor of each State desiring to administer its own permit program for discharges into navigable waters within its jurisdiction may submit to the Administration a full and complete description of the program it proposes to establish and administer under State law or under an interstate compact. In addition, such State shall submit a statement from the attorney general (or the attorney for those State water pollution control agencies which have independent legal counsel), or from the chief legal officer in the case of an interstate agency, that the laws of such State, or the interstate compact, as the case may be, provide adequate authority to carry out the described program. The Administrator shall approve each submitted program unless he determines that adequate authority does not exist:

(1) To issue permits which—

(A) *apply, and insure compliance with, any applicable requirements of sections 1311,* 1312, 1316, 1317, and 1343 of this title;

\* \* \* \* \* \*

(d) Notification of Administrator.

(1) Each State shall transmit to the Administrator a copy of each permit application received by such State and provide notice to the Administrator of every action related to the consideration of such permit application, including each permit proposed to be issued by such State.

(2) No permit shall issue (A) if the Administrator within ninety days of the date of his notification under subsection (b)(5) of this section objects in writing to the issuance of such permit, or (B) if the Administrator within ninety days of the date of transmittal of the proposed permit by the State objects in writing to the issuance of such permit *as being outside the guidelines and requirements of this chapter.*

\* \* \* \* \* \*

## SECTION 501

§ 1361. Administration.

(a) Authority of Administrator to prescribe regulations.

The Administrator is authorized to prescribe such regulations as are necessary to carry out his functions under this chapter.

\* \* \* \* \* \*

## SECTION 505

§ 1365. Citizen suits.

(a) Authorization; jurisdiction.

Except as provided in subsection (b) of this section, any citizen may commence a civil action on his own behalf—

(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) *an effluent standard or limitation under this chapter* or (B) an order issued by the Administrator or a State with respect to such a standard or limitation, or

(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.

The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an effluent standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties under section 1319(d) of this title.

\* \* \* \* \* \*

(f) Effluent standard or limitation.

For purposes of this section, *the term "effluent standard or limitation under this chapter" means* (1) effective July 1, 1973, an unlawful act under subsection (a) of section 1311 of this title; (2) *an effluent limitation or other limitation under section 1311* or 1312 of this title; (3) standard of performance under section 1316 of this title; (4) prohibition, effluent standard or pretreatment standards under section 1317 of this title; (5) certification under section 1341 of this title; or (6) *a permit or condition thereof issued under section 1342 of this title,* which is in effect under this chapter (including a requirement applicable by reason of section 1323 of this title).

\* \* \* \* \* \*

## SECTION 509

§ 1369. Administrative procedure and judicial review.

\* \* \* \* \* \*

(b)(1) *Review of the Administrator's action* (A) in promulgating any standard of performance under section 1316 of this title, (B) in making any determination pursuant to section 1316(b)(1)(C) of this title, (C) in promulgating any effluent standard, prohibition, or pretreatment standard under section 1317 of this title, (D) in making any determination as to a State permit program submitted under section 1342(b) of this title, (E) *in approving or promulgating any effluent limitation or other limitation under section 1311,* 1312, or 1316 of this title, and (F) *in issuing or denying any permit under section 1342 of this title,* may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts such business upon application by such person. Any such application shall be made within ninety days from the date of such

determination, approval, promulgation, issuance or denial, or after such date only if such application is based solely on grounds which arose after such ninetieth day.

ADAMS, Circuit Judge (concurring):

Although I subscribe completely to the majority's decision to remand to the Environmental Protection Agency this administrative action, two concerns compel additional comment. The more troubling one is that the Court has been obliged to find the power of the Administrator to issue effluent limitations by a series of subtle inferences, rather than by reference to clear statutory language. Also disturbing is the manner in which the Administrator has exercised his statutory duty to consider the costs of pollution control technology in relation to the benefits of abating pollution. This aspect of the Administrator's decision would seem to constitute another ground for remanding the Phase I iron and steel operation controls to the Administrator for further consideration.

## I.

The Water Pollution Control Act of 1972 is an important environmental protection measure, one of several such critical laws enacted in recent years. It holds promise for the American people that within a reasonable time the lakes and rivers of this country will no longer be threatened by unpurified discharges of industrial and residential waste. The undertaking Congress proposed was technologically uncertain and likely to prove costly as new facilities would have to be installed and old practices would have to be abandoned in order to achieve the desirable objectives set forth in the law.

Congress, nonetheless, viewed the problem of water pollution with a sense of urgency. It provided that effluent limitations for point sources compatible with the "best practicable control technology currently available" were to be achieved by July 1, 1977 [1] and that limitations consonant with the "best available technology economically achievable" were to be attained by July 1, 1983.[2] The Act expresses the goal that the 1983 limitations provide for water quality suitable for the protection of fish and wildlife and for recreational use, as well, and that all discharge of pollutants into navigable waters be eliminated by 1985.[3]

The states were chiefly responsible for the administration of the prior Act.[4] In contrast, the 1972 Act vested the authority to issue permits for the discharge of pollutants in the federal Environmental Protection Agency (EPA).[5] States were empowered to impose more stringent regulations on dischargers,[6] and to exercise an initial veto on applications for federal permits,[7] but the responsibility for prescribing minimum standards was vested in the EPA.[8] The EPA, however, was authorized by Congress to delegate its permit-granting authority to the states subject to conditions and safeguards, including the retention in the EPA of power to establish basic guidelines with which each state's implementation plan was to comply.[9] Each permit issued under a state plan was to be subject to EPA review and veto.[10] And should a state plan become inconsistent with the national water pollution regulations, the EPA was given authority to resume control of the issuance of permits in that state.[11]

1. § 301(b)(1)(A), 33 U.S.C. § 1311(b)(1)(A) (Supp. III 1973).

2. Id. (b)(2)(A).

3. § 101(a), 33 U.S.C. § 1251(a) (Supp. III 1973).

4. 33 U.S.C. 1151 et seq. (1970), as amended 33 U.S.C. § 1251 et seq. (Supp. III 1973).

5. § 402(a), 33 U.S.C. § 1342(a) (Supp. III 1973).

6. § 510, 33 U.S.C. § 1370 (Supp. III 1973).

7. § 401(a)(1), 33 U.S.C. § 1341(a)(1) (Supp. III 1973).

8. § 402(c)(2), 33 U.S.C. § 1342(c)(2) (Supp. III 1973).

9. Id. (b), (c).

10. Id. (d).

11. Id. (c)(3).

A critical issue common to this appeal and the *CPC* case [12] is the delegation to the states of the authority to establish minimum standards for pollutant discharge. Two issues determine the outcome of this aspect of each decision: First, are the effluent limitations described in section 301 of the Act to be imposed by a separate set of regulations with which state-issued permits for discharge must comply, or are the effluent limitations to be embodied instance by instance in the terms of each individual permit? Second, if the effluent limitations are separate regulations, is the federal government or the state to issue those regulations?

The Eighth Circuit has interpreted the Act as imposing the effluent limitations as conditions in each permit issued by a state authority, albeit congruent with the federal guidelines. Judge Hunter, in his able analysis, demonstrates that effluent limitations are to be a separate set of regulations, distinct from the permits, and that these regulations are to issue from the EPA, not from the states.

Regardless of the merits of the respective positions of the Eighth Circuit and this Court, both have had to arrive at their divergent interpretations of this fundamental aspect of the Act by inferences from ancillary provisions, and by deciphering the legislative intent from reading scraps and bits of a convoluted legislative history.

The failure to provide a clear procedural structure on so basic a matter in the administration of the Act is disquieting. In one sense, the difficulty of interpretation imposed here is of little consequence; it is the work of the courts to explicate the laws, no matter how complex their structure. In this instance, however, statutory vagueness inflicts harm on the purposes of the Act and impels the courts to determine the allo-

cation of authority between the national and state governments in the administration of this program. The conflict of interpretation between the Circuits does not initiate, but certainly perpetuates confusion in the administration of the legislation. Under these circumstances, neither the states nor the Administrator, nor the industries and municipalities which are to be regulated by the Act, may be confident which agency possesses the legal authority to promulgate effluent limitations. The result of such incertitude is delay in the implementation of the substantive provisions of the Act while the concerned parties engage in costly litigation to determine the legal powers of each enforcement agency. Such controversy postpones the achievement of the Act's lofty objectives, and imposes a burden on the Courts of Appeals and the Supreme Court which they might have been spared by careful drafting.

In addition, the difficulty in interpretation impinges on the powers of the coordinate branches of government within the federal system. Ours is a cooperative federalism in which the states and the national government share responsibilities for many programs. The definition of the roles of the state and national governments in areas where they share concurrent powers is essentially a matter for Congress, not for the courts.[13] The failure to create clear boundaries for the authority of the states and the EPA has thrust upon the courts a responsibility to infer legislative intent from the disparate provisions of this complex legislation. The courts have not evaded their responsibility, but our disagreement with the Eighth Circuit underlines the extent to which the courts can write law, even in areas of Congressional authority, when there has been a failure to manifest legislative intent by clear statutory commands.

---

**12.** *CPC International, Inc. v. Train,* 515 F.2d 1032 (8th Cir. 1975).
**13.** *See Franklin Nat'l Bank v. New York,* 347 U.S. 373, 378–79, 74 S.Ct. 550, 98 L.Ed. 767 (1954); *Palmer v. Massachusetts,* 308 U.S. 79, 84, 60 S.Ct. 34, 84 L.Ed. 93 (1939). *Cf. Douglas v. City of Jeannette,* 319 U.S. 157, 162–63, 63 S.Ct. 877, 87 L.Ed. 1324 (1943).

## II.

The Administrator's exercise of his discretion in connection with the cost analysis is the nub of my second concern. Congress has delegated to the Environmental Protection Agency a far-reaching power to strike a balance between water quality and the economy. In framing the guidelines for 1977 effluent limitations for existing point sources, the Administrator is directed by law to consider the costs of pollution control technology in relation to the benefits of pollution abatement. A reviewing court, asked by petitioners to declare an administrative action "arbitrary" or "an abuse of discretion," is not to substitute its judgment for that of the agency. The Court must make a careful inquiry, however, to ascertain whether the decision of the agency was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." [14] By this standard, set forth in *Citizens to Preserve Overton Park v. Volpe*, the conclusions of the Administrator with respect to the cost of applying the best practicable control technology would appear to be arbitrary. The record does not adequately demonstrate that his decision on the 1977 guidelines for existing point sources was based on a consideration of all the relevant factors.

Section 304(b)(1)(B) instructs the Administrator to consider "the total cost of application of [the best practicable control technology currently available] in relation to the effluent reduction benefits to be achieved from such application

. . . ." when establishing guidelines for the 1977 effluent limitations. [15] The elements of the total cost of applying the technology are not identified in the law itself. However, the legislative history of the Act may be used to support the notion that the term "total costs of application" encompasses not only the expense of erecting pollution control facilities but also the "external cost of potential unemployment, dislocation, and rural area development sustained by the community. . . ." [16]

Having accounted for the total costs of applying the requisite technology, the Administrator must consider those costs in relation to the benefits to be achieved from the application of the technology. The Act does not mandate an exacting quantitative comparison in the form of a technical benefit/cost analysis. Nevertheless, from the remarks of Senator Muskie in support of the conference bill it appears that, with respect to the 1977 guidelines, the Act does require the Administrator to make an analysis sufficient to indicate that "the additional degree of effluent reduction is [not] wholly out of proportion to the costs of achieving such marginal level of reduction. . . ." [17]

There is no doubt that Congress understood the difficulty and perhaps even the impossibility of reducing to monetary terms all, or even many, of the benefits from moderating pollution. [18] The Administrator's duty is to make the difficult comparison of the quantified and the unquantifiable. Nonetheless, by di-

**14.** *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971); *Duquesne Light Co. v. EPA*, 522 F.2d 1186, 1192 (3d Cir. 1975).

**15.** 33 U.S.C. § 1314(b)(1)(B) (Supp. III 1973). We note that the specific mandate to consider costs in relation to benefits is limited to the 1977 existing point source standards and does not appear to apply to the 1983 standards under subsection (b)(2)(B) or to new sources under section 306(b)(1)(B). In those sections the Administrator is, however, admonished to take costs "into account" or "into consideration." The admonition may be taken to imply some kind of comparison of costs and benefits, al-

though the proportionality between costs and benefits, indicated by section 304(b)(1)(B), would not seem to be required for these other sections.

**16.** *See* Library of Congress, Environmental Policy Division, *A Legislative History of the Water Pollution Control Act Amendments of 1972*, 93d Cong., 1st Sess. 231 (Comm. Print 1973). (Remarks of Rep. Jones).

**17.** *See id.* 170 (Remarks of Sen. Muskie). *Cf. id.* 1466 (Senate Report discussing the analysis of costs and benefits required by § 302).

**18.** *See id.* 1466.

recting the Administrator, when developing the guidelines for 1977, to consider the costs in relation to the benefits, even if only to the extent of determining that costs and benefits are not "wholly out of proportion," Congress may reasonably be understood to have required that the Administrator survey both costs and benefits thoroughly, each in the terms best suited to understanding its significance.

Costs and benefits could not be accurately compared, if the Administrator were to omit significant benefits, or significant costs, in evaluating pollution control technologies for 1977. Only on the basis of a comprehensive survey could the Administrator conscientiously determine that the costs and benefits of reducing pollution were in some way proportionate. Without the aid of such a survey, decisions might be rendered which distort the priorities intended by Congress.[19]

In this case, the Administrator has considered the plant costs of applying the control technology; however, his calculations in this respect are incomplete. In particular, he has assumed that all treatment facilities will be constructed on "green field" sites. Consequently, he has neglected to estimate any average costs for site clearance and preparation. Sites are assumed to need no extensive preparation such as rock excavation, pilings, drainage, grading, or tree removal.

In addition, "[l]and acquisition costs are not included in cost estimates." Other costs not considered in the Administrator's calculations include the costs of expanding utility support systems and interconnecting utility runs. Although the steel companies have presented only conclusory assertions regarding the significance of these excluded costs, the Administrator would seem to be obliged by the Act to consider these items as part of "the total cost of technology."[20] He cannot leave utterly out of account what might reasonably be expected to be significant cost factors.

If the Administrator is required to consider the external or secondary costs of applying the best practicable pollution control technology, it appears that he has also failed to satisfy the Act in this respect. Although a report commissioned by the Administrator[21] noted the possibility of some plant closings, which would create unemployment and dislocate local economies, the Administrator does not set forth the weight he attached to these considerations. Nor does he find the possibility of plant closings too remote to be considered. If some closings are reasonably foreseeable, the report cannot be said to have presented adequate estimates of the total cost of such eventualities. Similarly, the record does not reveal that the Administrator has discounted the necessity for a choice

19. Senator Muskie's references to the "additional degree of effluent reduction" and to "such marginal level of reduction" seem to indicate that the comparison required by Congress is not between total benefits and total costs, but between the costs and benefits attributable to each significant step in pollution abatement. Presumably an incremental analysis would avoid the risk of hidden imbalances between cost and benefit. Such imbalances could be of serious magnitude where, as here, major industries are the subjects of regulation. An incremental analysis would, of course, be more complex than a simple comparison of total costs and benefits. To the extent that estimates of total costs and benefits are aggregates of the costs and benefits of each step in the pollution abatement process, however, the basic data for incremental analysis should be readily available.

20. The costs in question will vary according to the conditions of each site, and the Administrator cannot be expected to produce exact costs for each site. He may, however, resort to estimated average figures.

21. The Administrator appears to adopt the report and its supplement by his statement at 39 Fed.Reg. 24118 (1974) that "[t]he total cost of implementing the effluent limitations guidelines includes . . . the indirect economic costs identified in . . . the supplementary report entitled "Economic Analysis of the Proposed Effluent Guidelines for the Integrated Iron and Steel Industry" (February 1974). The Administrator does not appear to engage in any more detailed discussion of indirect costs in the Final Development Document.

between expanded production capacity and the application of pollution control technology.[22] If such a choice must be made, the Administrator should examine the possibility of any substantial economic impact associated with it. To the extent that Congress intended "total costs" to include secondary costs, the Administrator, it seems to me, should give explicit consideration to whether such costs, if they are significant, are likely to be passed on to other industries and ultimately to consumers.

Where costs are to be evaluated "in relation to" the benefits of reducing pollution, as in the case of the 1977 guidelines, the Administrator should survey the extent of the benefits as well as the costs that the pollution control technology may be expected to provide. The Final Development Document, however, describes only the types of harm that pollution control technology will help to abate. It does not account for the extent of the injury to be alleviated by the control technology. Consequently, it cannot be ascertained from the record whether the benefits to be attained are substantial.

The Administrator has concluded that "the benefits of reducing the pollutants discharged justify the associated costs . . . ." of applying pollution control technology to Phase I iron and steel operations.[23] However, the failure of the Administrator to account fully for the costs of the control technology and to indicate in any way the extent of the benefits to be derived from reducing pollution, would seem to preclude meaningful comparison of costs and benefits. Any conclusions drawn from inadequate data would be without foundation. In view of these omissions, the Administrator's determination cannot be said to be based on a consideration of the relevant factors. Accordingly, it would not appear to meet the test of Overton Park.[24] It is quite conceivable that if all the facts were set forth, the Administrator's determination would not be a "clear error of judgment." But it is not the function of the appellate courts to "supply a reasoned basis for the agency's action." [25] Although courts are obliged to uphold an Administrator's position when the path to his decision is reasonably discernible,[26] the proceeding here presents this Court with an unblazed trail.

It is no small matter to which the Administrator is to direct his attention. A decision to protect the environment necessarily imposes heavy costs on the accustomed ways of production, employment, and consumption in this country. In passing the Water Pollution Control Act of 1972, Congress attempted to balance the improvement in the quality of

22. As justification for a determination that there is no need for an investment choice between *expansion of capacity and pollution* control, the Administrator submits newspaper articles on the financial condition of the steel industry that have appeared subsequent to the promulgation of the regulations. The Court accepts those materials, relying on the reasoning of *Amoco Oil Co. v. EPA*, 163 U.S.App. D.C. 162, 501 F.2d 722, 729 n.10 (1974). In the circumstances of this case, where the regulations are to be remanded to the Administrator for reconsideration in many respects, it appears to be unnecessary and perhaps inappropriate for the Court to take notice in this fashion of subsequently developed information.

As a general principle, moreover, it is disturbing that courts should consider subsequently developed information to determine whether an administrative decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To entertain such information may encourage the use of the courts as mere extensions of a continuous administrative process. It may also encourage some administrators to issue decisions that may well be arbitrary at the time of promulgation, hoping like Micawber that "something will turn up." Neither of these consequences would appear to enhance the efficiency of the courts or the confidence of citizens in the fairness of the administrative process. *See SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1760, 91 L.Ed. 1995 (1947); *SEC v. Chenery Corp.*, 318 U.S. 80, 94–95, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

23. 39 Fed.Reg. 24118 (1974).

24. 401 U.S. at 416, 91 S.Ct. 814.

25. *See Bowman Transportation, Inc. v. Arkansas-Best Freight Systems, Inc.*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974).

26. *See id.* 286, 95 S.Ct. 438.

our water with the costs of that worthy endeavor. Despite the ambitious goals expressed in section 101 of the Act, Congress has ordained a measured national effort at the first stage of enforcement, from 1977 to 1983, requiring pollution abatement at existing point sources to be bounded by some proportionality to its cost. The guidelines and effluent limitations to be established by the Administrator have the potential to affect management's investment decisions and, thereby, the employment prospects of thousands of citizens and the economic future of many communities. When an administrator's action has such ramifications, he would appear to have an obligation to move cautiously, taking care that his judgments at each important step of the way are founded on sound analysis and detailed study. It does not appear that the Administrator has acted with care sufficient to satisfy his obligations under section 304(b)(1)(B). For that reason I conclude that the inadequate consideration of the element of cost in setting the guidelines for best practicable control technology is an additional ground for remanding this action to the Administrator.